Opinion for the court filed by Circuit Judge WALLACH, in which RADER, Chief Judge, LOURIE, PROST, MOORE, O’MALLEY, and TARANTO, Circuit Judges, join.
Dissenting opinion filed by Circuit Judge DYK, in which NEWMAN and REYNA, Circuit Judges, join.
WALLACH, Circuit Judge.
In this federal employment case implicating national security, the Director of the Office of Personnel Management[2] (“OPM”) seeks review of the decision by the Merit Systems Protection Board (“Board”) holding that the Supreme Court’s decision in Department of the Navy v. Egan, 484 U.S. 518, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988), limits Board review only to actions involving security clearance *1151 determinations, ie., determinations concerning eligibility of access to classified information. Egan, however, is not so limited. Egan’s principles prohibit Board review of the Department of Defense’s (“DoD” or the “Agency”) determinations concerning eligibility of an employee to occupy a “sensitive” position, regardless of whether the position requires access to classified information.[3] As to the Respondents, we hold that Rhonda K. Conyers (“Conyers”) no longer maintains a cognizable interest in the outcome of this case. Ms. Conyers is therefore dismissed from this appeal. With respect to Devon Haughton Northover (“Northover”), we reverse and remand for further proceedings.
I. Background
Ms. Conyers and Mr. Northover[4] were indefinitely suspended and demoted, respectively, from their positions with the Agency after they were found ineligible to occupy “noncritical sensitive” positions.[5] Ms. Conyers and Mr. Northover independently appealed the Agency’s actions to the Board. In both appeals, the Agency argued that, because these positions were designated “noncritical sensitive,” the Board could not review the merits of the Agency’s eligibility determinations under Egan’s precedent.
A. The Egan Holding
In Egan, the Supreme Court held that the Board plays a limited role in adverse action cases involving national security concerns. The respondent in Egan lost his laborer’s job at a naval facility when he was denied a required security clearance. 484 U.S. at 520, 108 S.Ct. 818. Reversing our decision in Egan v. Department of the Navy, 802 F.2d 1563 (Fed.Cir.1986), rev’d, 484 U.S. 518, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988), the Court held that the Board does not have authority to review the substance of the security clearance determination, contrary to what is required generally in other adverse action appeals. 484 U.S. at 530-31, 108 S.Ct. 818. Rather, the Court held that the Board has authority to review only: (1) whether an Executive Branch employer determined the employee’s position required a security clearance; (2) whether the clearance was denied or revoked; (3) whether the employee was provided with the procedural protections specified in 5 U.S.C. § 7513; and (4) whether transfer to a nonsensitive position was feasible. Id. at 530, 108 S.Ct. 818.
B. Ms. Conyers’s Initial Proceedings
Ms. Conyers occupied a competitive service position of GS-525-05 Accounting Technician at the Defense Finance and Accounting Service. Conyers v. Dep’t of *1152 Def., 115 M.S.P.R. 572, 574 (2010). Following an investigation, the Agency’s Washington Headquarters Services (“WHS”) Consolidated Adjudications Facility (“CAF”) discovered information about Ms. Conyers that raised security concerns. J.A. 149-52. Effective September 11, 2009, the Agency indefinitely suspended Ms. Conyers from her position because she was denied eligibility to occupy a sensitive position by WHS/CAF. Conyers, 115 M.S.P.R. at 574. The Agency reasoned that Ms. Conyers’s noncritical sensitive “position required her to have access to sensitive information,” and because WHS/CAF denied her such access, “she did not meet a qualification requirement of her position.” Id.
Ms. Conyers appealed her indefinite suspension to the Board. Id. In response, the Agency argued that Egan prohibited Board review of the merits of WHS/CAF’s decision to deny Ms. Conyers eligibility for access “to sensitive or classified information and/or occupancy of a sensitive position.” Id. (internal citation and quotation marks omitted). On February 17, 2010, the administrative judge issued an order certifying the case for an interlocutory appeal and staying all proceedings pending resolution by the full Board. Id. at 575. In her ruling, the administrative judge declined to apply Egan and “informed the parties that [she] would decide the case under the broader standard applied in ... other [5 U.S.C.] Chapter 75 cases which do not involve security clearances.... ” Id. (brackets in original).
C. Mr. Northover’s Initial Proceedings
Mr. Northover occupied a competitive service position of GS-1144-07 Commissary Management Specialist at the Defense Commissary Agency. Northover v. Dep’t of Def., 115 M.S.P.R. 451, 452 (2010). Effective December 6, 2009, the Agency reduced Mr. Northover’s grade level to part-time GS-1101-04 Store Associate due to revocation/denial of his DoD eligibility to occupy a sensitive position. Id. at 453. In its Notice of Proposed Demotion, the Agency stated that Mr. Northover was in a position that was “designated as a sensitive position” and that WHS/CAF had denied him “eligibility for access to classified information and/or occupancy of a sensitive position.” Id. (internal citation and quotation marks omitted).
Mr. Northover subsequently appealed the Agency’s decision to the Board. Id. In response, the Agency argued it had designated the Commissary Management Specialist position a “moderate risk” national security position with a sensitivity level of “noncritical sensitive,” and under Egan, the Board is barred from reviewing the merits of the Agency’s “security-clearance/eligibility determination.” Id.
On April 2, 2010, contrary to the ruling in Conyers, the presiding chief administrative judge ruled that Egan applied and that the merits of the Agency’s determination were unreviewable. Id. The chief administrative judge subsequently certified his ruling to the full Board. Id. All proceedings were stayed pending resolution of the certified issue. Id.
D. The Full Board’s Interlocutory Review of Conyers and Northover
On December 22, 2010, the full Board affirmed the administrative judge’s decision in Conyers and reversed the chief administrative judge’s decision in North-over, concluding that Egan did not apply in cases where security clearance determinations are not at issue. Conyers, 115 M.S.P.R. at 590; Northover, 115 M.S.P.R. at 467-68. The Board held that Egan limits the Board’s review of an otherwise appealable adverse action only if that ac *1153 tion is based upon eligibility for or a denial, revocation, or suspension of access to classified information.[6] Conyers, 115 M.S.P.R. at 589-90; Northover, 115 M.S.P.R. at 467-68. Because Ms. Conyers and Mr. Northover did not occupy positions that required access to' classified information, the Board concluded that Egan did not preclude Board review of the underlying Agency determinations. Conyers, 115 M.S.P.R. at 585; Northover, 115 M.S.P.R. at 464.
OPM moved for reconsideration of the Board’s decisions, which the Board denied. Berry v. Conyers, 435 Fed.Appx. 943, 944 (Fed.Cir.2011) (order granting OPM’s petition for review). OPM petitioned for review to this court, and the petition was granted on August 17, 2011. Id. at 945. On August 17, 2012, a divided panel reversed the' Board, holding that Egan applied to this case and concluding that determinations pertaining to eligibility to occupy a “sensitive” position were unreviewable. Berry v. Conyers, 692 F.3d 1223 (Fed.Cir.2012). We granted rehearing en banc and vacated the panel decision on January 24, 2013. Berry v. Conyers, 497 Fed.Appx. 64 (Fed.Cir.2013). Oral arguments were held on May 24, 2013.
II. Jurisdiction
The underlying cases in Conyers and Northover were respectively dismissed by the Board as moot, Conyers v. Dep’t of Def., No. CH-0752-09-0925-I-3, 2011 WL 6939837 (M.S.P.B. Sept. 29, 2011), and dismissed without prejudice pending the outcome of this appeal, see J.A. 1765-67; 1821. The parties do not dispute that the case is moot as to Ms. Conyers. Because the parties agree that Ms. Conyers has no cognizable interest in the outcome of this appeal, her case is dismissed. Cooper v. Dep’t of the Navy, 108 F.3d 324, 326 (Fed.Cir.1997) (“If an appealable action is canceled or rescinded by an agency, any appeal from that action becomes moot.”). Conversely, the parties do not dispute that Mr. Northover maintains a cognizable interest in the outcome of this appeal, in part, because the Defense . Commissary Agency’s rescission of its action does not dispose of Mr. Northover’s discrimination claims. See J.A. 1765-67; 1821. Hence, Northover remains in this appeal.
We have jurisdiction under 5 U.S.C. § 7703(d)(1), which provides that OPM may seek review of a final Board order or decision when it determines the Board erred in interpreting a civil service law, rule or regulation, and that the decision will have a substantial impact on the administration of the civil service. The granting of OPM’s petition for judicial review is at the discretion of this court. Id.
While we may grant such petitions, the decision for review must be final, since this court lacks jurisdiction to review non-final Board decisions. See Weed v. Social Sec. Admin., 571 F.3d 1359, 1362-63 (Fed.Cir.2009) (Board’s remand order was not final order subject to immediate review). A motions panel and the prior merits panel held that the Board’s decisions in Conyers and Northover were appealable under the collateral order doctrine as articulated in Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). We agree that jurisdiction is proper to address OPM’s petition for review.
Cohen held that final decisions by district courts, pursuant to 28 U.S.C. § 1291, encompass not only judgments that “ter *1154 mínate an action,” but also a “small class” of collateral rulings that, although they do not end the litigation, are appropriately deemed “final.” 337 U.S at 545-46, 69 S.Ct. 1221. “That small category includes only decisions that are conclusive, that resolve important questions separate from the merits, and that are effectively unreviewable on appeal from the final judgment in the underlying action.” Id. at 546, 69 S.Ct. 1221. This “practical” approach applies to administrative actions. Mathews v. Eldridge, 424 U.S. 319, 330-31, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (allowing judicial review of administrative action on collateral issue). Although recognizing the differing policy considerations between appeals from district courts and administrative actions, Mathews emphasized the “core principle that statutorily created finality requirements should, if possible, be construed so as not to cause crucial collateral claims to be lost and potentially irreparable injuries to be suffered remains applicable.” Id. at 331 n. 11, 96 S.Ct. 893.
We find that the Board decision before this court is sufficiently conclusive to require resolution of Egan’s application to “sensitive” position determinations. Awaiting a final judgment in such eases would require Executive Branch agencies to litigate the merits and to potentially disclose matters concerning national security. Hence, this matter has the requisite “substantial impact on a civil service law,” § 7703(d)(1), and in turn, qualifies as one of those “small class” of collateral rulings that, although they do not end the litigation, are appropriately deemed “final,” Cohen, 337 U.S at 545-46, 69 S.Ct. 1221.
The Board asserts that under Kloeckner v. Solis, — U.S. -, 133 S.Ct. 596, 184 L.Ed.2d 433 (2012), this court lacks jurisdiction because, in part, Mr. Northover’s appeal is a “mixed” case involving a removal action in addition to a discrimination case properly before a federal district court. Kloeckner, however, interpreted 5 U.S.C. § 7703(b) and not § 7703(d), which is applicable here. As we reasoned in Homer:
There are sound reasons for Congress to establish in sections 7701 and 7703 different standards for the Director’s participation. Under section 7701, the Director’s participation before the board is in addition to the respondent agency’s participation. Under section 7703(d), the Director has sole authority to seek judicial review of a board decision that is unfavorable to an agency. The Director acts under section 7703 to protect the interests of the respondent agency or to protect the interests of the civil service as a whole.
Horner v. Schuck, 843 F.2d 1368, 1373 (Fed.Cir.1988). Accordingly, Northover is subject to immediate review under § 7703(d).
III. Statutory Grounds for National Security Based Removal of Government Employees
The statutes provide a two-track system for removal of employees based on national security concerns. Egan, 484 U.S. at 526, 108 S.Ct. 818. In particular, relevant provisions of the Civil Service Reform Act of 1978 (“CSRA”), Chapter 75 of Title 5 of the United States Code entitled, “Adverse Actions,” provide two subchapters related to removals. The first, subchapter II (§§ 7511-7514), relates to removals for “cause.” Under § 7512, a reduction in grade of an employee, as here, may qualify as an “adverse action.” 5 U.S.C. § 7512(3). An employee subject to an adverse action is entitled to the protections of § 7513, which include written notice of the specific reasons for the proposed action, an opportunity to respond to the charges, and the requirement that the agency’s action is taken to promote the efficiency of the service. An employee removed for “cause” has the right, under *1155 § 7513(d), to appeal to the Board. On review of the action by the Board under § 7701,[7] the agency must show that its decision is supported by a preponderance of the evidence. 5 U.S.C. § 7701(c)(1)(B). The appeal here proceeded pursuant to 5 U.S.C. § 7513(d).
The second, subchapter IV (§§ 7531-7533), relates to suspensions and removals based upon national security concerns. An employee suspended under § 7532(a) is not entitled to appeal to the Board. Nonetheless, the statute provides for a summary removal process that entitles the employee to specified pre-removal procedural rights, including a hearing by an agency authority. 5 U.S.C. § 7532(c).
IV. Egan’s Application to This Case
The Board and Northover urge this court to limit Egan’s application to security clearance determinations, reasoning that national security concerns articulated in that case pertain to access to classified information only. Egan cannot be so confined. Its principles instead require that courts refrain from second-guessing DoD national security determinations concerning eligibility of an individual to occupy a sensitive position, which may not necessarily involve access to classified information. For the following reasons, Egan must apply-
A. Egan Addressed Broad National Security Concerns That Are Traditionally the Responsibility of the Executive Branch
Egan, at its core, explained that it is essential for the President and the DoD to have broad discretion in making determinations concerning national security. In particular, Egan noted the absence of a statutory provision in § 7512 precluding appellate review of determinations concerning national security created a presumption in favor of judicial review. 484 U.S. at 526-27, 108 S.Ct. 818. The Court, nevertheless, held that “proposition is not without limit, and it runs aground when it encounters concerns of national security, as in this case, where the grant of security clearance to a particular employee, a sensitive and inherently discretionary judgment call, is committed by law to the appropriate agency of the Executive Branch.” Id. at 527, 108 S.Ct. 818 (emphasis added). Affording such discretion to agencies, according to Egan, “flows primarily from [the Commander in Chief Clause] and exists quite apart from any explicit congressional grant.” 484 U.S. at 527, 108 S.Ct. 818. The Court has consistently articulated that matters touching upon foreign policy and national security fall within “an area of executive action ‘in which courts have long been hesitant to intrude’ ” absent congressional authorization. Lincoln v. Vigil, 508 U.S. 182, 192, 113 S.Ct. 2024, 124 L.Ed.2d 101 (1993) (quoting Franklin v. Massachusetts, 505 U.S. 788, 819, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992) (Stevens, J., concurring in part and concurring in the judgment)); see also Egan, 484 U.S. at 529, 108 S.Ct. 818 (Foreign policy is the “province and responsibility of the Executive .... [C]ourts traditionally have been reluctant to intrude upon the authority of *1156 the Executive in military and national security affairs.”) (citation omitted).
The deference owed to the Executive Branch in these matters stems from our constitutional principle of separation of powers among the branches of government, see United States v. Curtiss-Wright Exp. Corp., 299 U.S. 304, 320, 57 S.Ct. 216, 81 L.Ed. 255 (1936) (recognizing the “plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations”), and the long-recognized convention that the judiciary’s institutional expertise is limited under these circumstances, Boumediene v. Bush, 553 U.S. 723, 797, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008) (“Unlike the President and some designated Members of Congress, neither the Members of this Court nor most federal judges begin the day with briefings that may describe new and serious threats to our Nation and its people. The law must accord the Executive substantial authority to apprehend and detain those who pose a real danger to our security.”). Indeed, Egan applied that same reasoning in the context of this case:
[I]t is not reasonably possible for an outside non-expert body to review the substance of such a judgment and to decide whether the agency should have been able to make the necessary affirmative prediction with confidence. Nor can such a body determine what constitutes an acceptable margin of error in assessing the potential risk.
484 U.S. at 529, 108 S.Ct. 818. This rationale applies to all prediction of risk regarding national security. Thus, absent congressional action, judicial review of national security matters is generally prohibited.[8]
The Board and Northover’s focus on only one factor, eligibility of access to classified information, is misplaced. The centerpiece of the Egan analysis, Executive Order No. 10,450, makes no mention of “classified information.”[9] Exec. Order No. 10,450, § 3, 3 C.F.R. 937 (1949-1953 *1157 Comp.) (“The head of any department or agency shall designate, or cause to be designated, any position within his department or agency the occupant of which could bring about, by virtue of the nature of the position, a material adverse effect on the national security as a sensitive position.”). In addition, other relevant statutes and regulations define “sensitive” position in the broadest sense by referring to “national security” generally. See 10 U.S.C. § 1564 (“Security clearance investigations .... (e) Sensitive duties. — For the purposes of this section, it is not necessary for the performance of duties to involve classified activities or classified matters in order for the duties to be considered sensitive and critical to the national security.”) (emphasis added); see also 5 C.F.R. § 732.102(“(a) For purposes of this part, the term national security position includes: (1) Those positions that involve activities of the Government that are concerned with the protection of the nation from foreign aggression or espionage....”). The Board and Northover also conflate “classified information” with “national security information,” but Egan does not imply those terms have the same meaning.. In fact, Egan’s core focus is not on “information,” but rather on the Executive’s discretion to act on threats — information-based or not — to national security generally. 484 U.S. at 527, 108 S.Ct. 818 (recognizing the government’s “ ‘compelling’ interest in withholding national security information”) (emphasis added).
As explained in Egan, government positions may require different types and levels of security protection, depending upon the sensitivity of the position sought. 484 U.S. at 528, 108 S.Ct. 818. A government appointment is expressly made subject to a background investigation that varies in scope according to the degree of adverse effect the applicant could have on national security. Id. (citing Exec. Order No. 10, 450, § 3, 3 C.F.R. 937 (1949-1953 Comp.)). As OPM states: “An agency’s national security calculus will vary widely depending upon, inter alia, the agency’s mission, the particular project in question, and the degree of harm that would be caused if the project is compromised.” OPM’s Br. 33. As a result, an agency’s determination concerning national security entails consideration of multiple factors.
For example, categorizing a sensitive position is undertaken without regard to access to classified information, but rather with regard to the effect the position may have on national security. See Exec. Order No. 10,450 § 3, 3 C.F.R. 937 (1949-1953 Comp.). Similarly, agencies make predictive judgments about an individual as:
an attempt to predict his [or her] possible future behavior and to assess whether, under compulsion of circumstances or for other reasons, he [or she] might compromise sensitive information. It may be based, to be sure, upon past or present conduct, but it also may be based upon concerns completely unrelated to conduct such as having close relatives residing in a country hostile to the United States.
Egan, 484 U.S. at 528-29, 108 S.Ct. 818. These predictive judgments are predicated on an individual’s potential to compromise national security, which may entail classified or unclassified information. Consequently, the inquiry in these Agency determinations concerning national security is not contingent upon access to “information.”
Even if the focus is placed on “information,” the Board and Northover fail to appreciate that the compelling interest of withholding both classified and unclassified information is not new. Courts have long recognized that sensitive but unclassified *1158 material can be vital to national security. See, e.g., Snepp v. United States, 444 U.S. 507, 511-12, 100 S.Ct. 763, 62 L.Ed.2d 704 (1980) (per curiam) (“[F]ormer intelligence agent’s publication of ... material relating to intelligence activities can be detrimental to vital national interests even if the published information is unclassified.”). The Court provides us with an illustrative example:
A foreign government can learn a great deal about the [CIA’s] activities by knowing the public sources of information that interest the Agency. The inquiries pursued by the Agency can often tell our adversaries something that is of value to them. For example, disclosure of the fact that the Agency subscribes to an obscure but publicly available Eastern European technical journal could thwart the Agency’s efforts to exploit its value as a source of intelligence information. Similarly, had foreign governments learned the Agency was using certain public journals and ongoing open research projects in its MKULTRA research of “brainwashing” and possible countermeasures, they might have been able to infer both the general nature of the project and the general scope that the Agency’s inquiry was taking.
CIA v. Sims, 471 U.S. 159, 177, 105 S.Ct. 1881, 85 L.Ed.2d 173 (1985) (internal citation omitted).
Certainly, unclassified information can have detrimental effects on national security the same way as classified information. That is acknowledged by Executive Order No. 13,526, which states, in part: “Compilations of items of information that are individually unclassified may be classified if the compiled information reveals an additional association or relationship that ... meets the standards for classification under this order____” Exec. Order No. 13,526, 75 Fed.Reg. 707 (Dec. 29, 2009); 32 C.F.R. § 2001.13(c). In addition, courts have recognized the same. See Kiareldeen v. Ashcroft, 273 F.3d 542, 551 n. 2 (3d Cir.2001) (“Certain information which would otherwise be unclassified when standing alone ... may require classification when combined with or associated with other unclassified or classified information. Additionally, when presented in a context that would reveal the FBI’s investigative interest in certain individuals, organizations, or countries, information which would normally be unclassified may be properly classified.”); see also Kasza v. Browner, 133 F.3d 1159, 1168-69 (9th Cir.1998) (recognizing the “mosaic” or “compilation theory” of classifying information based on a combination of unclassified items of information).
The Board nevertheless cites Cole v. Young, 351 U.S. 536, 76 S.Ct. 861, 100 L.Ed. 1396 (1956), and references the Court’s discussion of the legislative history of the Act of August 26, 1950[10] (“the Act”) in support of its proposition that national security concerns relate strictly to access to classified information. The Board’s analysis is flawed. Cole held that a sensitive position is one that implicates national security, and in defining “national security” as used in the Act, the Court concluded that the term “was intended to comprehend only those activities of the Government that are directly concerned with the protection of the Nation from internal subversion or foreign aggression, and not those which contribute to the strength of *1159 the Nation only through their impact on the general welfare.” 351 U.S. at 544, 76 S.Ct. 861 (emphasis added).[11] Thus, even in Cole, sensitive positions were defined as those that involve national security generally and not necessarily those that involve classified information only.
Furthermore, “sensitive positions” that can affect national security and “access to classified information” are parallel concepts that are not necessarily the same. As the Court reasoned:
Where applicable, the Act authorizes the agency head summarily to suspend an employee pending investigation and, after charges and a hearing, finally to terminate his employment, such termination not being subject to appeal. There is an obvious justification for the summary suspension power where the employee occupies a “sensitive” position in which he could cause serious damage to the national security during the delay incident to an investigation and the preparation of charges. Likewise, there is a reasonable basis for the view that an agency head who must bear the responsibility for the protection of classified information committed to his custody should have the final say in deciding whether to repose his trust in an employee who has access to such information.
Id. at 546, 76 S.Ct. 861 (emphasis added).[12] DoD regulations support this conclusion.
32 C.F.R. § 154.13(a) states “[cjertain civilian positions” that “entail duties of such a sensitive nature, including access to classified information” are referred to as “sensitive positions.” Hence, the regulations define “sensitive positions” as a position that may include but that is not limited to access to classified information. For example, DoD categorizes a position as “noncritical sensitive” position by considering one or more of the following criteria:
(A) Access to Secret or Confidential information.
(B) Security police/provost marshal-type duties involving the enforcement of law and security duties involving the protection and safeguarding of DoD personnel and property.
(C) Category II automated data processing positions.
(D) Duties involving education and orientation of DoD personnel.
(E) Duties involving the design, operation, or maintenance of intrusion detection systems deployed to safeguard DoD personnel and property.
(F) Any other position so designated by the head of the Component or designee.
32 C.F.R. § 154.13(b)(ii). A position entailing any one or more of these instructive examples and “the misconduct, malfeasance, or nonfeasance of an incumbent in any such position” would potentially have “an unacceptably adverse impact upon national security.” 32 C.F.R. § 154.13(a). The regulations contemplate the fact that a “noncritical sensitive” position requiring access to classified information is of the *1160 same substance as a “noncritical sensitive” position involving, inter alia, security police-type duties involving enforcement of law and protection and safeguarding of DoD personal property. Regardless of “access to classified information,” these positions might be sensitive.
Accordingly, there is no meaningful difference in substance between a designation that a position is “sensitive” and a designation that a position requires “access to classified information.” Rather, what matters is that both designations concern national security. As a result, Egan prohibits review of DoD national security determinations concerning eligibility of an individual to occupy a sensitive position, which may not necessarily involve access to classified information. Consequently, Egan’s pronouncements regarding national security must apply to this case absent contrary congressional action.
B. The CSRA Does Not Grant Broad Authority to the Board in This National Security Context
Despite the undisputed role of the Executive within this realm, Northover argues applying Egan to these cases “may deprive either the Congress or the Judiciary of all freedom of action merely by invoking national security.” Northover’s Br. 23. Certainly, under the Constitution, Congress has a substantial role in both foreign affairs and national security. Subject to Constitutional constraints, Congress has the power to guide and limit the Executive’s application of its powers. Neither the CSRA nor any other legislative action provides a basis for limiting the Executive’s role in these cases.
As Egan explained:
An employee who is removed for cause under § 7513, when his required clearance is denied, is entitled to the several procedural protections specified in that statute. The Board then may determine whether such cause existed, whether in fact clearance was denied, and whether transfer to a nonsensitive position was feasible. Nothing in the Act, however, directs or empowers the Board to go further.
484 U.S. at 530-31, 108 S.Ct. 818. As a result, Congress presumably has left the President and Executive Branch agencies broad discretion to exercise their powers in this area. See Dames & Moore v. Regan, 453 U.S. 654, 678, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981) (“Congress cannot anticipate and legislate with regard to every possible action the President may find it necessary to take or every possible situation in which he might act,” and “[s]uch failure of Congress ... does not, ‘especially ... in the areas of foreign policy and national security,’ imply ‘congressional disapproval’ of action taken by the Executive.”) (citation omitted). Accordingly, when “the President acts pursuant to an express or implied authorization from Congress,” his actions should be “ ‘supported by the strongest of presumptions and the widest latitude of judicial interpretation, and the burden of persuasion ... rest[s] heavily upon any who might attack it.’ ” Id. at 668, 101 S.Ct. 2972 (quoting Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 637, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Jackson, J., concurring)). Nothing in the CSRA directs otherwise.
The CSRA was amended in 1990 after United States v. Fausto, 484 U.S. 439, 108 S.Ct. 668, 98 L.Ed.2d 830 (1988). Fausto held the CSRA’S silence regarding appeal rights reflected congressional intent to preclude any review under chapter 75 for non-preference eligible members of the excepted service. Id. at 448, 108 S.Ct. 668. In response, Congress passed the Civil Service Due Process Amendments (“1990 Amendments”) expanding the Board’s ju *1161 risdiction to some, but not all, non-preference eligible excepted service employees. Pub.L. No. 101-376, 104 Stat. 461 (1990).
Northover construes the 1990 Amendments as extending by implication Board review of agency determinations concerning sensitive positions. Because certain agencies relating to national security, such as the FBI, CIA, and the NSA, were expressly exempted, Northover posits that Board review must extend to all other positions not expressly excluded. However, certain employees of the General Accounting Office, the Veterans Health Sciences and Research Administration, the Postal Service, the Postal Rate Commission, and the Tennessee Valley Authority were also excluded. See Pub.L. No. 101-376, 104 Stat. 461 (1990). The exclusion of these varying agencies negates North-over’s contention that there was a congressional directive for the Board to review security decisions affecting all employees of particular intelligence agencies. The argument that Congress crafted some exceptions for national security and not others is flawed; national security was not a categorical factor in these exclusions.
Similarly, the Board and Northover point to the creation of the . National Security Personnel System (“NSPS”) in 2003 to support their argument that Congress spoke on the issue before this court. This position is supported neither by statutory language nor legislative history. NSPS was established to overhaul the then-existing personnel management system and polices of the DoD. See National Defense Authorization Act, Pub.L. 108-136, 117 Stat. 1392 (2003). The Board and North-over’s focus on the provisions relating to appellate procedures, which replaced Board review and provided that: “[t]he Secretary ... may establish an appeals process that provides employees of the [DoD] organizational and’functional units that are included in the [NSPS] fair treatment in any appeals that they bring in decision relating to their employment....” Id. But the NSPS also provided for several other modifications to the DoD’s personnel system, including a pay for performance system and modifications to certain collective bargaining rights. Id.; see Am. Federation of Gov’t Emps., AFL-CIO v. Gates, 486 F.3d 1316, 1330 (D.C.Cir.2007).
In 2009, NSPS was repealed largely due to strong opposition from labor organizations regarding collective bargaining issues. H.R.Rep. No. 110-146 at 394 (2007) (“The committee is concerned that the implementing regulations, issued in November, 2005, exceeded congressional intent, especially with respect to limitations on employee bargaining rights.”); S.Rep. No. 110-77 at 11 (2007) (“Repealing the existing authority of the [DoD] to establish a new labor relations system under the [NSPS]. This would guarantee the rights of DoD employees to union representation in NSPS.”); see also S.Rep. No. 111-35 at 185 (2009) (“[T]he committee has received many complaints from DoD employees during the 5 years during which the D[oD] has sought to implement NSPS, to the detriment of needed human capital planning and workforce management .initiatives.”); Department of Defense Human Resources Management and Labor Relations Systems, 70 Fed.Reg. 66,116, 66,123 (November 1, 2005) (“Significant differences with many of the labor organizations remain.... ”). The statute creating the NSPS, the subsequent repeal of certain regulations concerning the DoD appeals process, and the ultimate repeal of the statute creating the NSPS itself in 2009, do not prove congressional intent to preclude DoD from insulating employment decisions concerning national security from Board review.
*1162 The Board and Northover nevertheless claim support in the enactment and subsequent repeal of the NSPS. In particular, Northover contends that Congress created the NSPS to give DoD power to foreclose Board review in non-security clearance cases because it recognized that Egan was confined to security clearances; Congress’ repeal of NSPS thereby returned to the full scope of Board review that had existed prior to the creation of the NSPS. These assertions are also speculative.
There is nothing in Congress’ enactment or repeal of NSPS indicating that Congress was concerned with the application of Egan. Indeed, changes proposed to the appeals process in the NSPS applied to all DoD employees, and therefore, they made no particular exceptions to security clearance determinations. In addition, the Board and Northover’s emphasis on the NSPS’s appellate process is misplaced because the NSPS did far more than attempt to replace the Board’s review of DoD employment cases, it fundamentally altered labor-management relations and pay structures. As discussed above, the NSPS faced strong opposition from labor organizations due to unpopular limitations on bargaining rights. That Congress chose to ultimately repeal the NSPS has no bearing on the issue in this case.
The Board and Northover further argue that Congress has spoken directly on the issue of removal for national security concerns by enacting § 7532. This argument has already been rejected by Egan, 484 U.S. at 533, 108 S.Ct. 818 (“The argument is that the availability of the § 7532 procedure is a ‘compelling’ factor in favor of Board review of a security-elearanee denial in a case under § 7513. We are not persuaded.”).
In Egan, the Court observed the alternative availability of § 7513 and § 7532. Id. at 532, 108 S.Ct. 818. Specifically, the Court acknowledged that § 7532 does not preempt § 7513 and that the two statutory provisions stand separately and provide alternative routes for administrative action. Id. In addition, the Court held that the two sections were not anomalous, but rather, different. Id. at 533, 108 S.Ct. 818. The Court also held that one section did not necessarily provide greater procedural protections than the other. Id. at 533-34, 108 S.Ct. 818.
The Court in Carlucci v. Doe, 488 U.S. 93, 109 S.Ct. 407, 102 L.Ed.2d 395 (1988), further articulated and clarified § 7532’s applicability. In that case, the Court determined that the summary removal mechanism(s) set out in § 7532 and 50 U.S.C. § 833[13] were discretionary mechanisms in cases involving dismissals for national security reasons. Id. at 100, 109 S.Ct. 407. The Court found that § 7532 was not mandatory, but permissive: “ ‘[njotwithstanding other statutes,’ the head of an agency ‘may’ suspend and remove employees ‘in the interests of national security.’ ” Id. at 100-01, 109 S.Ct. 407 (finding nothing in § 7532 or its legislative history indicating that the statute’s procedures are the exclusive means for removals on national security grounds or that § 7532 displaces the otherwise applicable removal provisions of the agencies covered by the section). Therefore, it was held that the National Security Agency was not required to apply either § 7532 or § 833 and was entitled to act under its ordinary dismissal procedure if it so wished.[14] Id. at 99-100, 109 S.Ct. 407.
*1163 Moreover, Carlucci held that Congress enacted § 7532 to “supplement, not narrow, ordinary agency removal procedures.” Id. at 102, 109 S.Ct. 407. The Court reasoned that because of its summary nature, “Congress intended § 7532 to be invoked only where there is an immediate threat of harm to the national security in the sense that the delay from invoking normal dismissal procedures could ‘cause serious damage to the national security.’ ” Id. (internal quotation marks omitted) (citing Cole v. Young, 351 U.S. 536, 546, 76 S.Ct. 861, 100 L.Ed. 1396 (1956)). Consequently, should § 7532 be mandatory as the Board and Northover effectively argue, it would become the exclusive procedure in this case and similar cases, and “no national security termination would be permissible without an initial suspension and adherence to the Cole v. Young standard.” Id. Given Carlucci’s teaching, we are unconvinced that Congress intended any such result when it enacted § 7532. Id. No congressional act exists curtailing the Executive’s inherent powers in these matters to make the underlying eligibility determination concerning national security. Thus applying Egan here, the DoD’s discretion to control the selection and retention of employees whose positions present risks to national security, whether or not they involve access to “information,” need not be second-guessed.
C. Predictive Judgments Must be Committed to Agency Discretion
National security concerns render the Board and Northover’s positions untenable. It is naive to suppose that employees without direct access to already classified information cannot affect national security. The Board and Northover’s narrow focus on access to classified information ignores the impact employees without security clearances, but in sensitive positions, can have.[15]
*1164 Defining the impact an individual may-have on national security is the type of predictive judgment that must be made by those with necessary expertise. See Egan, 484 U.S. at 529, 108 S.Ct. 818 (“The attempt to define not only the individual’s future actions, but those of outside and unknown influences renders the ‘grant or denial of security clearances ... an inexact science at best.’ ”) (citation omitted). When evaluating an individual for employment, it is those with such expertise who effectively can apply the Agency’s “clearly consistent with the interests of national security” standard, which otherwise would conflict with the Board’s “preponderance of the evidence” standard. While in certain circumstances courts can certainly consider the merits of a decision concerning national security, Egan held that scenario unworkable here:
As noted above, security clearance normally will be granted only if it is “clearly consistent with the interests of the national security.” The Board, however, reviews adverse actions under a preponderance of the evidence standard. § 7701(c)(1)(B). These two standards seem inconsistent. It is difficult to see how the Board would be able to review security-clearance determinations under a preponderance of the evidence standard without departing from the “clearly consistent with the interests of the national security” test. The clearly consistent standard indicates that security-clearance determinations should err, if they must, on the side of denials. Placing the burden on the Government to support the denial by a preponderance of the evidence would inevitably shift this emphasis and involve the Board in second-guessing the agency’s national security determinations.
Id. at 531, 108 S.Ct. 818. DoD regulations require that the determination of an employee’s ineligibility to hold a sensitive position must be “consistent with the interests of national security.” See 32 C.F.R. § 154.6(b) (“The personnel security standard that must be applied to determine whether a person is eligible for access to classified information or assignment to sensitive duties is whether, based on all available information, the person’s loyalty, reliability, and trustworthiness are such that entrusting the person with classified information or assigning the person to sensitive duties is dearly consistent with the interests of national security”) (emphasis added); see also Exec. Order No. 10,450, § 3, 3 C.F.R. § 937 (1949-1953 Comp.). Thus, such Agency determinations cannot be reviewable by the Board because it would improperly place an inconsistent burden of proof upon the government.
Further, the sources upon which intelligence is based are often open and publically available. Sometimes, intelligence is obtained from sources in a fashion the source’s government would find improper. Occasionally, those means of obtention are coercive and/or subversive. For example, *1165 the intelligence community may view certain disparaging information concerning an employee as a vulnerability which can be used to blackmail or coerce information out of the individual. See Egan, 484 U.S. at 528, 108 S.Ct. 818 (recognizing that the government has a compelling interest in protecting truly sensitive information from those who, “under compulsion of circumstances or for other reasons ... might compromise sensitive information”). The type of information that can be coerced may vary depending on the employee’s position.
In this case, Mr. Northover was a Commissary Management Specialist for the Defense Commissary Agency. This position is not the type of position that involves mere stocking of items on shelves. It is a management position that entails carrying out a range of computer assisted ordering tasks. The work is described to include generating and utilizing a wide variety of system reports as inventory and merchandising management tools. The incumbent is responsible for training, overseeing, and monitoring the work of lower-grade employees. A Commissary Management Specialist may work uncommon tours of duty as required. At bottom, this position does not merely involve a “low-level” employee whose duties and exposure are inconsequential.
This area of National Security Law is largely about preventing human source intelligence gathering in a manner which does not, in an open society, unnecessarily limit the public’s right to access information about its government’s activities. Still, there clearly is a need for such prevention. Within the sphere of national security limitations on government employment, our society has determined that courts should defer to the agencies’ threat limiting expertise. See Egan, 484 U.S. at 528-30, 108 S.Ct. 818.
While threats may change with time, Egan’s analysis remains valid. The advent of electronic records management, computer analysis, and cyber-warfare have made potential espionage targets containing means to access matters concerning national security vastly more susceptible to harm by people without security clearances. The mechanics of planting within a computer system a means of intelligence gathering are beyond the ken of the judiciary; what matters is that there are today more sensitive areas of access than there were when Egan was authored. Its underlying analysis, nevertheless, is completely applicable — the President, as Commander-in-Chief, has the right and the obligation, within the law, to protect the nation against potential threats. Id. at 527, 108 S.Ct. 818.
The potential for arbitrary application of this right under the guise of national security is a point of contention for Northover and the Board. These concerns however do not require a different result. Specifically, Northover and the Board raise concerns of the likely preclusion of judicial review of any alleged constitutional and statutory violations (e.g., whistleblower retaliation) for federal employees.[16] Egan *1166 rejected similar concerns of arbitrary designations and pretextual removal of federal employees, and there is no basis for a different conclusion in this case. Indeed, these concerns can no more justify review of an eligibility determination than of a clearance determination. Former Chief Judge Markey’s analysis is worth noting:
The ... underlying rationale is a felt necessity to “protect” civilian employees against “arbitrary” denials of security clearances. Amicus and the majority see the boogy-men of “specious, arbitrary, discriminatory” clearance denials.... Whence the fear of arbitrary denials? Whence the automatic refusal of even a modicum of at least initial trust in Navy officials? Whence the disregard of the process (denial response denial appeal final denial) conducted by the Navy ... before denying a clearance? .... The conjecture that Navy officials might act arbitrarily is not only unwarranted, it is far too weak a reed on which to rest a determination that MSPB must decide which employees of the armed forces should be granted security clearances. Given that the responsibility is the Navy’s, and given the system of high level, objective, impersonal, decisionmaking employed by the Navy in carrying out that responsibility, including the employee’s chance to respond and to appeal to higher authority within the agency, I can see no reason why, under those circumstances, the Navy should not be allowed to exercise its judgment in exercising its authority to grant or deny security clearances.
Egan v. Dep’t of Navy, 802 F.2d 1563, 1576-77 (Fed.Cir.1986) (Markey, C.J. dissenting), rev’d, 484 U.S. 518, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988) (emphasis in original). Moreover, DoD maintains an internal review process of eligibility determinations, which undermines the concerns Northover and the Board raise. See 32 C.F.R. § 154.56; see also Romero v. Dep’t of Def., 658 F.3d 1372, 1374 (Fed.Cir.2011) (articulating the general organizational framework and review process used by the DoD when making security clearance determinations). Accordingly, the merits of the Agency determination before us are not reviewable by the Board.
V. Conclusion
For the foregoing reasons, the Board cannot review the merits of DoD national security determinations concerning eligibility of an employee to occupy a sensitive position that implicates national security. There is nothing talismanic about eligibility for access to classified information. The core question is whether the Agency determination concerns eligibility of an employee to occupy a sensitive position that implicates national security. When the answer to that question is in the affirmative, Egan applies and the Board plays a limited role in its review of the determination. Thus, the Board’s decision with respect to Mr. Northover is reversed and remanded for further proceedings consistent with this decision. Ms. Conyers’s appeal is dismissed for lack of jurisdiction.
DISMISSED IN PART, REVERSED, AND REMANDED.

. Elaine D. Kaplan look office as the Director of the Office of Personnel Management during the pendency of this case, replacing John Berry. Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Director Kaplan is automatically substituted as Petitioner in this case.

. Ms. Conyers and Mr. Northover are DoD employees. DoD regulations define "sensitive” positions as those that may have an effect on national security. See 32 C.F.R. § 154.13. We do not have before us the regulations of other agencies. Accordingly, we do not consider non-DoD "sensitive” positions.

. The Board, Ms. Conyers, and Mr. Northover were all Respondents in this case. This court will refer to the Board as the "Board,” Mr. Northover as "Northover,” and Ms. Conyers as “Conyers,” where discussion is appropriate given her dismissal.

.Departments and agencies of the Government classify jobs in three categories: "critical sensitive,” "noncritical sensitive,” and "nonsensitive.” Egan, 484 U.S. at 528, 108 S.Ct. 818. The underlying cases involve "noncritical sensitive” positions, which are defined as: "Positions with potential to cause damage to ... national security, up to and including damage at the significant or serious level. These positions include: (1) Access to Secret, "L," Confidential classified information[;] (2) Any other positions with potential to cause harm to national security to a moderate degree....” J.A. 326 (emphases added).

. The Board considered "security clearance” to be synonymous with "access to classified information.” Conyers, 115 M.S.P.R. at 580.

. 5 U.S.C. § 7701 provides, in relevant part:
"An employee, or applicant for employment, may submit an appeal to the Merit Systems Protection Board from any action which is appealable to the Board under any law, rule, or regulation.” 5 U.S.C. § 7701(a). It is undisputed that Northover is an "employee” as defined in the applicable statutes in this case. See 5 U.S.C. § 751 l(a)(l)(A)(i), (ii) ("[E]mployee means ... an individual in the competitive service ... who is not serving a probationary or trial period under an initial appointment; or ... who has completed 1 year of current continuous service under other than a temporary appointment limited to 1 year or less.”).

. The Dissent argues that we should afford Chevron deference to the Board’s interpretation of its own jurisdiction under the CSRA. Dissent 21. Although Chevron would normally apply to the Board’s interpretation of the CSRA, where the agency’s interpretation raises serious constitutional doubts, courts are required to inquire whether there exists another permissible interpretation. Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. and Const. Trades Council, 485 U.S. 568, 575-76, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988). The principle of separation of powers dictates here and we do not read the CSRA to “as-sum[e] that Congress ... casually authorize administrative agencies to interpret a statute to push the limit of congressional authority.” Solid Waste Agency of N. Cook Cnty., 531 U.S. 159, 172-73, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001). The President has the primary responsibility along with the necessary power to protect the national security. The Board cannot usurp that power by asserting Chevron.

. The Dissent contends no Presidential Order here authorizes the DoD to make judgments whether an employee is a risk to national security. Dissent 4. Executive Order No. 10,-450 directs agencies, such as the DoD, to establish programs "to insure that the employment and retention ... of any civilian ... employee ... is clearly consistent with the interests of the national security.” That Presidential Order applied in Egan. It applies here. The Dissent nevertheless claims support in Cole v. Young, 351 U.S. 536, 76 S.Ct. 861, 100 L.Ed. 1396 (1956), but the Dissent’s reliance on Cole is erroneous. The question in Cole was whether the Civil Service Commission could review Mr. Cole's discharge from the military. The government conceded the review was expressly authorized by the Veterans’ Preference Act of 1944 ("VPA”), but argued express authorization in the VPA can be overridden by Executive action pursuant to Executive Order No. 10,450. Thus, the issue presented was whether the Executive could override express Congressional authority to take action. In this case, as in Egan, there is no such express Congressional authority.

. The Act of August 26, 1950, Pub.L. No. 81-733, ch. 803, 64 Stat. 476 (1950), gave heads of certain departments and agencies of the Government summary suspension and unreviewable dismissal powers over their civilian employees, when deemed necessary in the interest of the national security of the United States. Conyers, 115 M.S.P.R. at 583 n. 17. The Act was the precursor to 5 U.S.C. § 7532. Id.

. “It follows that an employee can be dismissed 'in the interest of the national security’ under the Act only if he occupies a ‘sensitive’ position, and thus that a condition precedent to the exercise of the dismissal authority is a determination by the agency head that the position occupied is one affected with the 'national security.’ ” Cole, 351 U.S. at 551, 76 S.Ct. 861 (emphasis added). Accordingly, the Court in Cole remanded the case to determine whether the petitioner’s position was one in which he could adversely affect national security. Id. at 557, 76 S.Ct. 861.

. By using the word, “likewise,” the Court compares the two concepts, “sensitive positions” and “access to classified information.” In doing so, it makes clear that they are parallel but not identical concepts.

. Section 833 was a summary removal provision in the 1964 National Security Agency Personnel Security Procedures Act, 50 U.S.C. §§ 831-35 (repealed October 1, 1996).

. The Carlucci Court also affirmed Egan's ' conclusion regarding §§ 7513 and 7532:
We thus agree with the conclusion of the Merit Systems Protection Board in a similar *1163 case that "section 7532 is not the exclusive basis for removals based upon security clearance revocations,” Egan v. Department of the Navy, 28 M.S.P.R. 509, 521 (1985), and with the Court of Appeals for the Federal Circuit that "[t]here is nothing in the text of section 7532 or in its legislative history to suggest that its procedures were intended to preempt section 7513 procedures whenever the removal could be taken under section 7532. The language of section 7532 is permissive.” Egan v. Department of the Navy, 802 F.2d 1563, 1568 (Fed.Cir.1986), rev’d, 484 U.S. 518, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988). Carlucci, 488 U.S. at 95, 109 S.Ct. 407.

. There are certainly numerous government positions with potential to adversely affect national security. The Board goes too far by comparing a government position at a military base commissary to one in a "Seven Eleven across the street.” Oral Argument at 28:10-15, Berry v. Conyers, 2011-3207 (May 11, 2012), available at http://www.cafc. uscourts.gov/oral-argument-recordings/ search/audio.html. Commissary employees do not merely observe "[g]rocery store stock levels” or otherwise publicly observable information. Northover’s Br. 20. In fact, commissary stock levels of a particular unclassified item — sunglasses, for example, with shatterproof lenses, or rehydration backpacks— might well hint at deployment orders to a particular region for an identifiable unit. Such troop movements are inherently secret. Cf. Near v. State of Minnesota ex rel. Olson, 283 U.S. 697, 716, 51 S.Ct. 625, 75 L.Ed. 1357 (1931) (" 'When a nation is at war many things that might be said in time of peace are such a hindrance to its effort that their utterance will not be endured so long as men fight and that no Court could regard them as protected by any constitutional right....’ No one would question but that a government might prevent actual obstruction to its recruiting service or the publication of the sailing dates of transports or the number and location of troops.”) (quoting Schenck v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470 (1919)) (emphasis added). This is not mere speculation, because, as OPM contends, numbers and locations could very well be derived by a skilled intelligence analyst from military commissary stock levels. See Oral Argument *1164 at 13:19-14:03, Berry v. Conyers, 2011-3207 (May 11, 2012), available at http://www.cafc. uscourts.gov/oral-argument-recordings/ search/audio.html (Q: "Can a position be sensitive simply because it provides observability? That is, one of these examples that was given was someone working at a commissary; it seems to me that someone working at a commissary has an opportunity, without access to classified information, to observe troop levels, potential for where someone is going, from what they are buying, that sort of thing.” A: "I think that is right your honor. We agree with that, and I think in Egan, he, Mr. Egan worked on a nuclear submarine. And so, part of it was simply from what he was observing by coming and going of a nuclear submarine. And so, sensitivity can be the place where the employee works, what are they able to observe, what could they infer from, what you say, from the purchases and shipments....”).

. Petitioners and several amici discuss the terms and purposes behind the Whistleblower Protection Act, Pub.L. No. 101-12, 103 Stat. 16 (1989) ("WPA”), at great length in their briefs. They contend that the WPA limits the Executive's discretion with respect to the termination or suspension of individuals in sensitive positions where those employment determinations are tied to retaliation for the disclosure of certain classes of information. Petitioners and amici contend that Congress exercised its own authority to protect national security when it passed the WPA because it recognized that disclosures of certain improprieties may actually advance the interests of national security. Whether Congress intended to limit the authority of the Executive in making employment decisions when passing *1166 the WPA is not before us, however. There are no whistleblower claims or defenses asserted here. We address only those issues presented by Mr. Northover's case.