**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 18-1890**

WALTON CAMPBELL,

Plaintiff – Appellant,

v.

RYAN D. MCCARTHY, Secretary of the Army,

Defendant – Appellee.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Claude M. Hilton, Senior District Judge. (1:17-cv-00568-CMH-TCB)

Argued: December 10, 2019                    Decided: March 5, 2020

Before KING, AGEE, and RICHARDSON, Circuit Judges.

Vacated and remanded by published opinion. Judge King wrote the opinion, in which Judge Agee and Judge Richardson joined. Judge Richardson wrote a separate concurring opinion.

**ARGUED:** Nina Yuanyuan Ren, KALIJARVI, CHUZI, NEWMAN & FITCH, P.C., Washington, D.C., for Appellant. Sean Douglas Jansen, OFFICE OF THE UNITED STATES ATTORNEY, Norfolk, Virginia, for Appellee. **ON BRIEF:** Richard R. Renner, KALIJARVI, CHUZI, NEWMAN & FITCH, P.C., Washington, D.C., for Appellant. G. Zachary Terwilliger, United States Attorney, Lauren A. Wetzler, Chief, Civil Division, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

KING, Circuit Judge:

Plaintiff Walton Campbell, a civilian employee of the Army Corps of Engineers, initiated this civil action against the Secretary of the Army (the "Army") challenging the Army's decision to suspend him from his employment pending review of his security clearance.[1] In his operative complaint, Campbell alleges three claims: a claim under Title VII of the Civil Rights Act of 1964 (the "Title VII claim"), a claim under the Age Discrimination in Employment Act of 1967 (the "Age claim"), and a claim under the Whistleblower Protection Act of 1989 (the "Whistleblower claim"). After dismissing without prejudice the Whistleblower claim for failure to exhaust administrative remedies, the district court awarded summary judgment to the Army on the Title VII and Age claims. Shortly thereafter, the court denied Campbell's motion to alter or amend judgment. Campbell has appealed and, as explained below, we are satisfied that the Supreme Court's decision in *Department of the Navy v. Egan*, 484 U.S. 518 (1988), deprived the district court of jurisdiction to review any of Campbell's claims. We therefore vacate and remand for dismissal.

---

[1] Campbell started these proceedings in the District of Columbia. After that district court granted the Army's motion to transfer venue to the Eastern District of Virginia, Campbell filed his operative complaint in Alexandria. *See Campbell v. Speer*, No. 1:17-cv-00568 (D.D.C. May 17, 2017), ECF No. 11; *Campbell v. Speer*, No. 1:17-cv-00568 (E.D. Va. Jul. 7, 2017), ECF No. 28. Campbell therein sued the Acting Secretary of the Army in his official capacity. The Secretary of the Army in his official capacity has properly been substituted as the defendant. *See* ECF Nos. 3, 44.

## I.

On July 27, 2004, Walton Campbell began working as a physical scientist at the Topographic Engineering Center, a laboratory of the Corps of Engineers' Engineer Research and Development Center.[2] Located adjacent to Fort Belvoir in Alexandria, the Topographic Engineering Center develops "products that could improve the U.S. Army's warfighting capabilities," and physical scientists employed there must maintain a top secret security clearance with sensitive compartmented information access. *See* J.A. 127.[3] Because of the classified nature of its work, the Topographic Engineering Center is a "restricted area" subject to prohibitions against recording and photographic devices in certain sections thereof. And many Topographic Engineering Center employees work in the Center's Sensitive Compartmented Information Facility, in which recording and photographic devices are prohibited entirely.

## A.

Within months of starting his job, Campbell became embroiled in a workplace dispute with three of his coworkers. Because the escalation of that dispute resulted in the suspension of Campbell's employment pending review of his security clearance by the Army's Central Clearance Facility, we first relate the circumstances of that dispute.

---

[2] The Topographic Engineering Center is now called the Army Geospatial Center.

[3] Citations herein to "J.A. __" refer to the contents of the Joint Appendix filed by the parties in this appeal. Because this appeal concerns an award of summary judgment, we recite the facts in the light most favorable to Campbell, as the non-moving party. *See United States v. Ancient Coin Collectors Guild*, 899 F.3d 295, 312 (4th Cir. 2018).

1.

When Campbell began working at the Topographic Engineering Center, he did not possess a security clearance. As a result, he was assigned duties unrelated to his physical scientist position while his security clearance application was processed. During that time, Campbell was assigned to work on the Source Acquisition Team. Campbell's first-level supervisor was then Mary Pat Santoro, the Chief of the Information Services Branch.

While he was assigned to the Source Acquisition Team, Campbell would regularly have lunch with three of his younger coworkers, Tish Kennan, Alana Hubbard, and Marty Downing. Kennan, Hubbard, and Downing wished, however, that Campbell would not socialize with them because his behavior made them uncomfortable. That was because, among other things, Campbell described himself as a person who often sought revenge and remarked that he knew how to construct bombs. Kennan, in particular, related that Campbell frequently paid her unwanted attention. Campbell would stare at her and refer to her as "Trouble." *See* J.A. 214. He also told Kennan that he had located information about her estranged husband on the internet and that he had driven through the neighborhood where she resided. On several occasions, Campbell had given Kennan unwanted gifts. For example, Campbell gave Kennan a battery cleaner after she commented that she needed to jump-start her car. And Campbell often followed Kennan around, "wait[ing] for [her] outside the bathroom" or "[standing] aside while [she] was having conversations with others so that he could follow [her] afterwards." *Id.* at 218.

On February 9, 2005, the Army granted Campbell a top secret security clearance with sensitive compartmented information access. Campbell's security clearance thus

4

authorized him to access information that, if released, would result in "exceptionally grave damage to national security." *See* J.A. 196. That security clearance also allowed Campbell to access the Sensitive Compartmented Information Facility, and his workspace was relocated therein. In accepting his security clearance, Campbell agreed to abide by certain conditions. Relevant here, Campbell agreed to report any change in his legal residence within seven days.

2.

Thirteen days later, on February 22, 2005, Campbell was transferred from the Source Acquisition Team to the Current Operations Team. As a result of this transfer, Charles Lopez, the Chief of the Terrain Analysis Branch, became Campbell's first-level supervisor. And although Campbell no longer worked with Kennan, Hubbard, or Downing, he continued to visit them in the Source Acquisition Team's workspace and to involve himself in their lunch plans. By the end of that week, on February 25, 2005, Campbell had worn out his welcome. That day, without invitation, Campbell went to the Source Acquisition Team's workspace and watched Kennan and Hubbard as they worked. At one point, R. Paul Harwig — a Division Chief of the Topographic Engineering Center and Campbell's second-level supervisor — entered the workspace and observed Campbell "sitting too close" to Kennan and Hubbard. *See* J.A. 197. When Kennan and Hubbard left to go to lunch, Campbell followed them. Hubbard recalled that "because of his disturbing behavior," they were too "scared" to tell Campbell that he was not welcome to join them for lunch. *Id.* at 216.

Following an unpleasant lunch outing to a Chili's restaurant, Kennan and Hubbard reported their concerns about Campbell's behavior to Division Chief Harwig. More specifically, they informed Harwig that they were planning to tell Campbell that "he could no longer go to lunch and that he could no longer follow [them] around [the Topographic Engineering Center], and that [they] did not want any more gifts from him." *See* J.A. 216-17. In response, Harwig asked the Current Operations Team Leader, Jeffrey Popp, to inform Campbell that he was no longer permitted in the Source Acquisition Team workspace, that he was not to distract Kennan and Hubbard from their work, and that he was to minimize his contacts with Kennan and Hubbard. Team Leader Popp relayed those instructions to Campbell on February 28, 2005.

3.

Shortly after meeting with Team Leader Popp, on March 7, 2005, Campbell sent an e-mail message entitled "Whistleblowing on aberrant staff behavior" to Topographic Engineering Center leadership, including Division Chief Harwig and Branch Chief Lopez. *See* J.A. 199-205. In that message and an accompanying attachment, Campbell denied any wrongdoing and made allegations concerning the "professionalism and mental stability of [Kennan and Hubbard], who hold current [sensitive compartmented information] clearances and have access to classified materials." *Id.* at 199. Regarding Kennan, Campbell claimed that her complaints about him were the result of a laundry list of "personal stresses." *Id.* at 199, 203-04. And Campbell painted Hubbard as a "disgruntled employee," who, during the lunch outing of February 25, 2005, complained "angr[ily] and openly" about having to train new employees (a complaint that Campbell surmised was

6

"unusual for a proud mother of two") and used "vitriolic language" to describe her supervisor's and a coworker's professional competence. *Id.* Following an investigation into Campbell's allegations, Harwig concluded that Campbell's e-mail "was in retaliation as a result of having his feelings hurt and that his allegations [had] no merit." *Id.* at 208.

On the evening of March 9, 2005, after learning of Campbell's allegations against her, Kennan reported to Branch Chief Santoro that Campbell's behavior made her feel unsafe at work. And Kennan explained to Santoro that she no longer felt safe outside of work because Campbell had tried to follow her home from the Topographic Engineering Center that afternoon. Kennan related that, as she was driving home, she saw Campbell pull into traffic behind her. Believing that Campbell was following her, Kennan "purposefully made a series of turns to evade him" and returned to the Topographic Engineering Center to make her report to Santoro. *See* J.A. 209.

Division Chief Harwig and Branch Chief Lopez met with Campbell on March 10, 2005, and informed him that he was under investigation for misconduct related to his interactions with Kennan and Hubbard. On that occasion, Campbell was instructed to avoid all contact with Kennan and Hubbard and to relocate his workspace from the Sensitive Compartmented Information Facility to a less-restricted section of the Topographic Engineering Center. On the next day, March 11, 2005, Harwig, Lopez, Team Leader Popp, and the Topographic Engineering Center Chief of Security, Thomas Cain, met with Campbell regarding Kennan's stalking allegations. That meeting was held in a room of the Topographic Engineering Center in which information classified as secret may

7

be discussed. After the meeting, Campbell remained in the room while potentially classified information was discussed.

During the weekend, in addition to relating her stalking allegations to Branch Chief Santoro, Kennan obtained from a Fairfax County magistrate an emergency protective order against Campbell, which resulted in the issuance of an arrest warrant for stalking.[4] When Fairfax County police officers sought to execute that warrant using the legal residence that Campbell had reported to the Topographic Engineering Center, they discovered that it was a post-office box address. Because the officers were unable to locate Campbell's residence, the Fort Belvoir Military Police and Security Chief Cain detained Campbell upon his arrival at work on Monday, March 14, 2005. Campbell was searched by the Fairfax County police officers when they arrived to execute the arrest warrant. The search revealed that Campbell was wearing a microcassette recorder with a microphone that was wired from the recorder through his shirt sleeve to his wristwatch. The officers also recovered a cellphone with a camera, two additional driver's licenses in Campbell's name from Louisiana and Texas, a digital voice recorder, and a pen that appeared to contain a recording device (but that was actually an FM radio).

Believing that Campbell's possession of the recording devices posed a national security threat, the Army Criminal Investigation Command and the FBI were notified. FBI Special Agents interviewed Campbell, and Campbell explained that he intended to record

---

[4] On October 19, 2005, Campbell was tried on the stalking charge in a Fairfax County court. The jury found Campbell not guilty.

his conversations with Kennan so that he would have proof if she threatened him. Campbell also admitted that he attempted to record the March 11, 2005, meeting in order to protect himself from Kennan's stalking accusations. The FBI Agents concluded that, although Campbell had committed a security violation, he had not managed to compromise any classified information.

B.

Contemporaneously, the Director of the Topographic Engineering Center and Campbell's third-level supervisor, Robert Burkhardt, notified the Commanding Officer of the Engineer Research and Development Center, Colonel James Rowan, of Campbell's stalking arrest and his possession of the recording devices and out-of-state driver's licenses. Director Burkhardt also informed Colonel Rowan that Campbell had provided a post-office box address as his legal residence. Based on that information, Rowan determined that Campbell "posed a risk to national security" and suspended Campbell's access to classified information. *See* J.A. 123, 243. Rowan subsequently recommended that the Central Clearance Facility permanently revoke Campbell's security clearance. That recommendation was predicated on Rowan's conclusion that revocation was "in the interests of national security" because of Campbell's "potential criminal conduct, personal conduct and inappropriate use of photography equipment and recording devices in a restricted area." *Id.* at 191, 245. Before making the recommendation regarding Campbell, Rowan had never recommended a permanent revocation of an Engineer Research and

9

Development Center employee's security clearance. On April 4, 2005, Campbell was notified that his security clearance had been suspended.[5]

By memorandum of April 27, 2005, Division Chief Harwig notified Campbell of his proposal to suspend Campbell from his employment with the Army pending review of his security clearance by the Central Clearance Facility. This proposed suspension was based on Campbell's provisional loss of his security clearance, plus the requirement of Campbell's position that he maintain a security clearance. And the memorandum further specified why Campbell's security clearance had been suspended:

1.  "Violation of security regulations or practices whereby [Campbell] brought recording devices, both voice and image into a secure facility on multiple occasions." *See* J.A. 188.

2.  "Acts of commission that indicate poor judgment, unreliability or untrustworthiness whereby [Campbell] covertly recorded conversation with [his] supervisors." *Id.*

3.  "Knowingly misrepresenting [his] current legal residence to [his] supervisor, Mr. Chuck Lopez." *Id.*

4.  "Acts of commission that indicate poor judgment, unreliability or untrustworthiness whereby [Campbell] created a disturbance in the workplace involving co-workers." *Id.*

On May 19, 2005, Campbell, with counsel, submitted an oral reply to Director Burkhardt, who was responsible for deciding whether to adopt Division Chief Harwig's proposal to suspend Campbell from his employment. Campbell did not dispute that his security clearance was suspended for the reasons articulated in Harwig's memorandum.

_____

[5] We refer herein to Campbell's access to classified information and his security clearance collectively as his "security clearance."

10

Rather, Campbell argued that he should be reassigned to unclassified duties while the Central Clearance Facility reviewed his security clearance. Nonetheless, based on the reasons that Campbell's security clearance was suspended, Burkhardt determined that Campbell's actions were distinguishable from other Engineer Research and Development Center employees who had lost access to classified information but were reassigned to unclassified duties. Amplifying Harwig's statement of the reasons that Campbell's security clearance was suspended, Burkhardt explained:

1. "On 14 March 05, [Campbell] entered a restricted facility, namely the [Topographic Engineering Center], wearing a recording microphone on [his] wrist that was connected via a wire through [his] sleeve to a micro cassette recorder in [his] pants pocket. On that date, [he] secretly recorded conversations inside the restricted facility." *See* J.A. 229.

2. "On 14 March 05, [Campbell] entered a restricted facility, namely the [Topographic Engineering Center], bringing with [him] a digital voice recorder, and a cell phone camera with capabilities for both still images and video." *Id.* at 230.

3. "On 14 March 05, [Campbell] admitted to an FBI Special Agent that [he] 'had recorded another conversation with [his] supervisors.' [Campbell's] supervisors [reported] that that conversation took place on 11 March 2005 in room 506, which is a classified area. They [also reported] that [Campbell] remained in room 506 after that conversation while another conversation took place in which classified material was discussed. . . . Because [Campbell] wore a wire on two separate dates, [he] intentionally disregarded national security regulations and policies, and *showed a willingness to compromise classified information* for the sake of [his] own, personal interests." *Id.* (emphasis added).

4. "Instead of providing [his] current [legal] residence, [Campbell] provided a post office box number at a commercial mail facility." *Id.*

5. "[Campbell] created a disturbance in the workplace involving coworkers. Specifically, [Campbell] boasted to co-workers that [he

11

was] a person who sought revenge and knew how to make bombs. [Campbell's] boast created fear and apprehension on the part of [his] co-workers, and such fear and apprehension stifles open and timely discussion and reporting of suspicious or unusual activity, which could have a significant impact on the mission and on National Security." *Id.*

In short, Burkhardt determined that Campbell's actions resulting in the suspension of his security clearance were distinguishable from those of the Engineer Research and Development Center employees who were reassigned to unclassified duties because Campbell had taken "overt action that could have compromised classified information." *See* J.A. 229. Namely, Campbell brought recording and photographic devices to the Topographic Engineering Center and attempted to record conversations therein, misrepresented his legal residence, and made his coworkers feel unsafe. Burkhardt further related that "[t]he Commander of the [Engineer Research and Development Center] ha[d] never recommended that any clearance be revoked, until [Campbell's] case. In all cases, not one of the employees took any overt action that could have compromised classified information." *Id.* For those reasons — that is, the reasons why Campbell's security clearance had been suspended — Burkhardt concluded that "[u]nder the circumstances, [Campbell's] retention in duty status would be detrimental to national security interests." *Id.* at 231. Burkhardt thus suspended Campbell's employment with the Army pending review of his security clearance.

## C.

Twelve years later, in early 2017, following lengthy administrative proceedings before the Department of Defense Office of Hearings and Appeals and the Equal

12

Employment Opportunity Commission (the "EEOC"), Campbell commenced this civil action against the Army.[6] Campbell alleges that the Army discriminated and retaliated against him when it declined to reassign him to unclassified duties and instead suspended him pending review of his security clearance. Those allegations underlie the three claims of his operative complaint, that is, the Title VII claim, the Age claim, and the Whistleblower claim.

Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), the Army moved in July 2017 to dismiss Campbell's operative complaint for lack of subject matter jurisdiction and for failure to state a claim. Especially pertinent here, the Army argued that the Supreme Court's decision in *Department of the Navy v. Egan*, 484 U.S. 518 (1988), deprived the district court of jurisdiction to review any of Campbell's claims. The Army also maintained that judicial review of the Whistleblower claim was foreclosed by Campbell's failure to exhaust administrative remedies and that he had failed to sufficiently state claims of discrimination or retaliation.

On September 18, 2017, after argument of the motion to dismiss, the district court declined to dismiss the Title VII and Age claims, concluding that it was "of the opinion that [Campbell had] stated claims upon which recovery may be had." *See Campbell v. Speer*, No. 1:17-cv-00568, slip op. at 1 (E.D. Va. Sept. 18, 2017), ECF No. 41. And the

_____

[6] The proceedings before the Department of Defense Office of Hearings and Appeals resulted in the restoration of Campbell's security clearance on September 26, 2007. Notwithstanding, on March 19, 2014, an EEOC administrative judge found in favor of the Army. The EEOC proceedings concluded on December 2, 2016, when the administrative judge's decision was affirmed by the Office of Federal Operations.

court dismissed without prejudice the Whistleblower claim because Campbell had "not exhausted his administrative remedies." *Id.* The court did not, however, address the Army's argument that, under *Egan*, it lacked subject matter jurisdiction to review any of Campbell's claims.

Thereafter, for reasons explained in its Opinion of April 16, 2018, the district court awarded summary judgment to the Army on the Title VII and Age claims. Although the Army again argued that review of any of Campbell's claims was foreclosed by *Egan*, the court failed to address that contention. Reaching the merits of Campbell's claims, the court ruled that Campbell could not establish a prima facie case of either sex or age discrimination, that the Army had "provided legitimate, non-discriminatory reasons for the suspension decision, and [that Campbell could not] demonstrate that those reasons were pretextual." *See Campbell v. Speer*, No. 1:17-cv-00568, slip op. at 6-7 (E.D. Va. Apr. 16, 2018), ECF No. 65. The court also ruled that Campbell could not establish a prima facie case of retaliation and that he had "not produced evidence to show that [the Army's] justifications [for the suspension were] pretextual." *Id.* at 8-9. Subsequently, the court denied Campbell's motion to alter or amend judgment. This appeal followed, and we possess jurisdiction under 28 U.S.C. § 1291.[7]

---

[7] Our jurisdiction extends to the Whistleblower claim even though the district court dismissed that claim without prejudice. Of course, "[t]he jurisdiction of a court of appeals is generally limited to the review of final decisions made by the district courts, within the meaning of 28 U.S.C. § 1291, and to the review of certain interlocutory orders, as provided for in 28 U.S.C. § 1292." *See Williamson v. Stirling*, 912 F.3d 154, 169 (4th Cir. 2018). And a dismissal without prejudice is generally not an appealable final order. *See De'Lonta v. Johnson*, 708 F.3d 520, 523 n.2 (4th Cir. 2013). Nevertheless, when "the grounds of the (Continued)

14

II.

We review de novo a district court's dismissal of a complaint for lack of subject matter jurisdiction. *See Doe v. Meron*, 929 F.3d 153, 163 (4th Cir. 2019). We also review de novo a district court's award of summary judgment. *See United States v. Ancient Coin Collectors Guild*, 899 F.3d 295, 312 (4th Cir. 2018). In this appeal, however, because the Army maintains that the district court lacked subject matter jurisdiction to review any of Campbell's claims, we are obliged to first address the question of jurisdiction. *See Sigmon Coal Co. v. Apfel*, 226 F.3d 291, 299 (4th Cir. 2000), *aff'd sub nom. Barnhart v. Sigmon Coal Co.*, 534 U.S. 438 (2002); *Goldsmith v. Mayor & City Council of Balt.*, 845 F.2d 61, 64 (4th Cir. 1988).

III.

In *Department of the Navy v. Egan*, a civilian Navy employee with a criminal record and history of alcohol abuse was denied a security clearance. *See* 484 U.S. 518, 521-22 (1988). He accordingly became ineligible for his Navy position. *Id.* After the Merit Systems Protection Board concluded that it lacked authority to review the Navy's security clearance decision, the employee appealed. *Id.* at 522-25. Emphasizing that classifying

---

dismissal make clear that no amendment could cure the defects in the plaintiff's case," a dismissal order is "final in fact and therefore appealable." *See Goode v. Cent. Va. Legal Aid Soc'y, Inc.*, 807 F.3d 619, 623 (4th Cir. 2015) (internal quotation marks omitted). Here, Campbell could not cure his failure to exhaust administrative remedies for the Whistleblower claim by amending his complaint. Accordingly, the Order dismissing the Whistleblower claim without prejudice is a final appealable decision. We thus possess jurisdiction to review the court's dismissal of that claim pursuant to § 1291.

15

and controlling access to "information bearing on national security" is the province of the Executive, the Supreme Court recognized that "the protection of classified information must be committed to the broad discretion of the agency responsible," including the "broad discretion to determine who may have access to it." *Id.* at 527, 529. To that end, the Court reasoned that the "[p]redictive judgment" required of security clearance decisions was best left to "those with the necessary expertise in protecting classified information." *Id.* at 529. The Court thus agreed that, absent specific authorization from Congress (and there was none), the Merit Systems Protection Board did not possess the authority to review the reasons underlying a security clearance decision. *Id.* at 530.

We have adhered to the view that *Egan* generally proscribes judicial review of a security clearance decision "absent a specific mandate from Congress providing otherwise." *See Hegab v. Long*, 716 F.3d 790, 794 (4th Cir. 2013); *Reinbold v. Evers*, 187 F.3d 348, 357-58 (4th Cir. 1999); *Becerra v. Dalton*, 94 F.3d 145, 148-49 (4th Cir. 1996); *Guillot v. Garrett*, 970 F.2d 1320, 1324-25 (4th Cir. 1992); *see also Jamil v. Sec'y, Dep't of Def.*, 910 F.2d 1203, 1205-06 (4th Cir. 1990) (extending *Egan* to judicial review of security clearance decisions). And we have never discerned an "unmistakable expression of purpose by Congress in Title VII [of the Civil Rights Act of 1964]" to subject security clearance decisions "to judicial scrutiny." *See Becerra*, 94 F.3d at 149.[8] But we have not

---

[8] Several of our sister circuits have also concluded that, under *Egan*, security clearance decisions cannot be reviewed for violations of Title VII. *See, e.g.*, *Ryan v. Reno*, 168 F.3d 520, 523-24 (D.C. Cir. 1999); *Brazil v. U.S. Dep't of the Navy*, 66 F.3d 193, 196-97 (9th Cir. 1995).

had occasion to consider whether Congress has provided for judicial review of security clearance decisions through the Age Discrimination in Employment Act of 1967 (the "ADEA") or the Whistleblower Protection Act of 1989 (the "WPA"). As explained below, Congress has not specifically provided for any such review in either statute.

## A.

We first consider the ADEA. And, as it must, our inquiry begins with the plain language thereof. *See Stewart v. Iancu*, 912 F.3d 693, 702 (4th Cir. 2019). After all, Congress' intent generally will be most apparent "from the words of the statute itself." *See Sigmon Coal Co. v. Apfel*, 226 F.3d 291, 304 (4th Cir. 2000), *aff'd sub nom. Barnhart v. Sigmon Coal Co.*, 534 U.S. 438 (2002). "To determine a statute's plain meaning, we not only look to the language itself, but also the specific context in which the language is used, and the broader context of the statute as a whole." *See Hately v. Watts*, 917 F.3d 770, 784 (4th Cir. 2019) (internal quotation marks omitted).

As codified at 29 U.S.C. § 633a, the federal-sector provision of the ADEA prohibits age discrimination against federal employees. *See* 29 U.S.C. § 633a. Specifically, § 633a provides that "[a]ll personnel actions" involving federal employees "who are at least 40 years of age . . . shall be made free from any discrimination based on age." *Id.* § 633a(a). To that end, the EEOC "is authorized to enforce" § 633a(a) "through appropriate remedies, including reinstatement or hiring of employees with or without backpay." *Id.* § 633a(b). Section 633a further authorizes "[a]ny person aggrieved" to "bring a civil action" for "such legal or equitable relief as will effectuate the purposes" thereof. *Id*. § 633a(c). "[B]y its terms," § 633a thus "does not confer broad authority" on the federal courts to review

17

security clearance decisions. *See Egan*, 484 U.S. at 530. That is, nothing in § 633a plainly "evidence[s] the kind of unmistakable expression of purpose," *see Becerra*, 94 F.3d at 149 (quoting *Guillot*, 970 F.2d at 1325), that *Egan* requires in order to subject a security clearance decision to review by "an outside nonexpert body" such as a federal court, *see Egan*, 484 U.S. at 529.

Our confidence that Congress did not provide for judicial review of security clearance decisions through the ADEA is bolstered by § 633a's legislative history. Though we generally "need look no further" if the plain language of the statute is unambiguous, *see Hately*, 917 F.3d at 784, mirroring the Supreme Court's approach in *Egan*, we will consider § 633a's "language along with . . . its legislative history," *see Egan*, 484 U.S. at 530 (internal quotation marks omitted). We do so to confirm that Congress did not otherwise express its intent to subject security clearance decisions to judicial review for violations of § 633a. *See King v. Burwell*, 135 S. Ct. 2480, 2496 (2015) (recognizing that courts must "take care not to undo what [Congress] has done"); *In re Sunterra Corp.*, 361 F.3d 257, 265 (4th Cir. 2004) (recognizing that when plain meaning conflicts with "clearly expressed" congressional intent, a court may look beyond unambiguous statutory language (internal quotation marks omitted)).

Like the legislative history for the ADEA's private-sector provisions, the legislative history for § 633a indicates that Congress was primarily concerned with "remov[ing] discriminatory barriers against employment of older workers." *See* S. Rep. No. 93-690, at 56 (1974); H.R. Rep. No. 93-913, at 40-41 (1974); *see also* S. Rep. No. 90-723, at 7 (1967) ("It is not the purpose of [the ADEA's private-sector provisions] to require the employment

18

of anyone, regardless of age, who is not qualified on grounds other than age to perform the job. . . . The purpose of this legislation, simply stated, is to insure that age, within the limits prescribed herein, is not a determining factor in a refusal to hire."); H.R. Rep. No. 90-805, at 6 (1967) (explaining that the "primary objective" of the ADEA's private-sector provisions is "the promotion of employment opportunities for older workers"). Indeed, Congress appears to have considered § 633a's applicability to government personnel actions taken in the interests of national security and declined to disturb the discretion of the Executive with respect to such actions. When submitting the Conference Report for the Fair Labor Standards Amendments of 1974, Pub. L. No. 93-259, 88 Stat. 55 (1974), which set forth § 633a, the Bill's sponsor explained:

> Questions have been raised about the applicability of the Age Discrimination provisions to the discretion which now may rest in the heads of certain executive agencies to terminate an employee in the interests of the national security of the United States. It was not the intent of the conferees to affect the exercise of such discretion, other than by barring actions which, in fact, would be illegal, such as a termination of employment or a refusal to hire based on age.

*See* 120 Cong. Rec. 8,764 (1974).[9] We are thus satisfied that there is no "unmistakable expression of purpose by Congress" in § 633a of the ADEA to authorize judicial review of security clearance decisions. *See Becerra*, 94 F.3d at 149; *Guillot*, 970 F.2d at 1325.

---

[9] In determining legislative intent, the statements of a bill's sponsor made during debate are "entitled to weight." *See Lewis v. United States*, 445 U.S. 55, 63 (1980).

19

Next, we turn to the WPA. And, again, our inquiry begins with the plain language of the statute. *See Stewart*, 912 F.3d at 702. As codified at 5 U.S.C. § 2302, the WPA proscribes "personnel action" taken in retaliation for certain whistleblowing activities. Those activities include (1) the disclosure of information evidencing violations of "any law, rule, or regulation" or "gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety" and (2) "the exercise of any appeal, complaint, or grievance right granted by any law, rule, or regulation." *See* 5 U.S.C. §§ 2302(b)(8), (9)(A). And § 2302(a)(2)(A) of Title 5 identifies twelve types of prohibited personnel actions. Only one of those personnel actions — that is, "any other significant change in duties, responsibilities, or working conditions" — could conceivably cover a security clearance decision. *Id.* § 2302(a)(2)(A)(xii).

Arguably, a security clearance decision could result in "a significant change in duties, responsibilities, or working conditions," by rendering a federal employee ineligible for her position. *See* 5 U.S.C. § 2302(a)(2)(A)(xii). But *Egan* requires an "unmistakable expression of purpose by Congress" to subject a security clearance decision to judicial scrutiny. *See Becerra*, 94 F.3d at 149; *Guillot*, 970 F.2d at 1325. We thus cannot conclude that "by its terms," the WPA specifically "confer[s] broad authority . . . to review a security-clearance determination." *See Egan*, 484 U.S. at 530; *Hesse v. Dep't of State*, 217 F.3d 1372, 1378 (Fed. Cir. 2000) (concluding that § 2302(a)(2)(A)(xii) "falls far short of constituting a specific statement of congressional intent to authorize review of security clearance determinations"); *see also SKY CABLE, LLC v. DIRECTV, INC.*, 886 F.3d 375,

388 (4th Cir. 2018) (recognizing that "*ejusdem generis* instructs that, when general words follow the enumeration of specific items in a list, the general words apply only to other items akin to those specifically enumerated" (internal quotation marks omitted)).

Likewise, our examination of the relevant legislative history — in particular that of the Whistleblower Protection Enhancement Act of 2012 (the "WPEA"), Pub. L. No. 112-199, 126 Stat. 1465 (2012) — fortifies our conclusion that Congress did not intend to provide for judicial review of security clearance decisions through the WPA. The legislative history for the WPEA — which strengthened whistleblower protections, in part by amending the WPA — reflects that Congress explicitly recognized a "critical need" to extend "the protections for whistleblowers to include those who are retaliated against through the loss of their security clearances or access to classified information." *See* S. Rep. No. 112-155, at 35-36 (2012) (citing *Hesse*). And although Congress appears to have considered providing for review of retaliatory security clearance decisions by both the Merit Systems Protection Board and the federal courts, the Senate Homeland Security and Governmental Affairs Committee Report accompanying the 2012 Act explained "that an Executive Branch process can provide adequate review of security clearance retaliation." *Id.* at 36, 39. For the reasons specified therein, the Act did not "provide for any judicial review of security clearance retaliation claims" by whistleblowers in the WPA, or elsewhere. *Id.* at 40.[10] Therefore, we are similarly satisfied that there is no "unmistakable

---

[10] The WPEA as enacted did not contain any provision extending whistleblower protections to security clearance decisions. *See* Pub. L. No. 112-199, 126 Stat. 1465 (2012); *see also Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 200 (1974) (observing (Continued)

21

expression of purpose by Congress" in the WPA to subject security clearance decisions to judicial review. *See Becerra*, 94 F.3d at 149; *Guillot*, 970 F.2d at 1325.

C.

Because Title VII, the ADEA, and the WPA do not specifically provide for judicial review of a security clearance decision, we must evaluate whether any of Campbell's three claims against the Army can be assessed without reviewing the suspension of his security clearance. And we are readily satisfied that they cannot. As a result, *Egan* deprived the district court of subject matter jurisdiction in this litigation.

Under *Egan*, a claim that an adverse employment decision violated a plaintiff's statutory rights is unreviewable when it "necessarily depends upon a review of" an agency's security clearance decision. *See Guillot*, 970 F.2d at 1326. In other words, when review of such a claim requires review of "the very issue[] that the Supreme Court has held [is] non-reviewable" — namely, a security clearance decision — *Egan* deprives the federal courts of subject matter jurisdiction. *See Becerra*, 94 F.3d at 149.

---

that the deletion of language from the statute as enacted "strongly militates against a judgment that Congress intended a result that it expressly declined to enact"). A similar provision that also committed review of certain agencies' retaliatory security clearance decisions to the Executive was later enacted as part of the Intelligence Authorization Act for Fiscal Year 2014. *See* Pub. L. No. 113-126, 128 Stat. 1390, 1417-20 (2014).

Campbell argues that Director Burkhardt's conclusion that Campbell posed a unique threat to national security and thus could not be reassigned to unclassified duties was simply a pretext for discrimination and retaliation.[11] But Campbell's security clearance was suspended for the same reasons relied on by Burkhardt to reach that conclusion. Under the burden-shifting framework upon which Campbell's Title VII and Age claims rely, determining whether the reasons for suspending Campbell were legitimate and non-pretextual thus requires review of the Army's security clearance decision. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 807 (1973); *Ryan v. Reno*, 168 F.3d 520, 523-24 (D.C. Cir. 1999); *Brazil v. U.S. Dep't of the Navy*, 66 F.3d 193, 196-97 (9th Cir. 1995). Therefore, the district court lacked subject matter jurisdiction with respect to the Title VII and Age claims. So too with the Whistleblower claim, which requires reviewing the Army's security clearance decision to determine whether Campbell was suspended for engaging in some protected activity rather than for the reasons he provisionally lost his security clearance. *See Bonds v. Leavitt*, 629 F.3d 369, 381 (4th Cir. 2011) (setting forth requirements for claim of WPA retaliation).

Seeking to clear this jurisdictional hurdle, Campbell emphasizes the Supreme Court's conclusion in *Egan* that, under 5 U.S.C. § 7513, the Merit Systems Protection Board has jurisdiction to review "adverse actions" to determine "whether transfer to a

---

[11] During oral argument of this appeal, Campbell's primary assertion was that he was "entitled to reasonable inferences" that Director Burkhardt's conclusion that he "posed a unique threat" and thus could not be reassigned to unclassified duties was "pretextual." *See* Oral Argument at 1:10-1:20, *Campbell v. Esper*, No. 18-1890 (4th Cir. Dec. 10, 2019), http://www.ca4.uscourts.gov/oral-argument/listen-to-oral-arguments.

nonsensitive position was feasible." *See Egan*, 484 U.S. at 530. Accordingly, Campbell maintains that jurisdiction to review his claims — each of which concern Director Burkhardt's refusal to reassign him to unclassified duties — is unaffected by *Egan*. He is mistaken in that regard.

Contrary to Campbell's assertion, *Egan* does not "impose on an agency the obligation, independent of statute or regulation, to transfer employees who lose their security clearance." *See Jamil*, 910 F.2d at 1208. Rather, when an "independent source for a right to a transfer [to a nonsensitive position] exists," *Egan* authorizes a limited review of whether such a transfer is feasible. *Id.* at 1208-09; *Guillot*, 970 F.2d at 1326-27. Campbell argues that, in this case, such a review is enabled by the prior instances in which Engineer Research and Development Center employees who lost their access to classified information were reassigned to unclassified duties. But nothing in this record refutes Director Burkhardt's determination that the Engineer Research and Development Center's past practice was inapposite to Campbell. As with Burkhardt's ultimate conclusion that Campbell's "retention in duty status would be detrimental to national security interests," that determination was predicated on the reasons that Campbell's security clearance was suspended. *See* J.A. 229-31. We do not see how, in these circumstances, the Engineer Research and Development Center's past practice provides an "independent source for a right to a transfer" as contemplated by *Egan* and our precedents. *See Jamil*, 910 F.2d at 1208-09; *Guillot*, 970 F.2d at 1326-27.

\* \* \*

In sum, Campbell was suspended by the Army pending review of his security clearance for the very same reasons that he provisionally lost his security clearance. Because review of any of Campbell's claims requires review of the suspension of his security clearance — a review that necessarily "goes to the very heart of the protection of classified information" — *Egan* deprived the district court of subject matter jurisdiction to review each of Campbell's claims. *See Becerra*, 94 F.3d at 149. The court thus erred by failing to dismiss these claims outright for lack of subject matter jurisdiction.

IV.

Pursuant to the foregoing, we vacate the district court's judgment and remand for dismissal of the operative complaint for want of subject matter jurisdiction.

*VACATED AND REMANDED*

RICHARDSON, Circuit Judge, concurring:

I readily join the majority's fine opinion in full. But I write separately to note the Supreme Court's odd use of legislative history in this context. It is hard to fathom how we might unearth within legislative history 'a specific mandate from Congress' or 'an unmistakable expression of purpose' to overcome the presumption against review of security-clearance decisions made by the executive branch. The "psychoanalysis of Congress" is a "weird endeavor" in any event, *United States v. Public Utilities Commission of California*, 345 U.S. 295, 319 (1953) (Jackson, J., concurring), but particularly so when the sensitivity and importance of a discretionary executive branch action requires that we avoid review in the first place. But the Supreme Court has instructed that we try. *Department of the Navy v. Egan*, 484 U.S. 518, 530 (1988). And so we do.