Francisco B. BECERRA,
Plaintiff–Appellant,

v.

John H. DALTON, Secretary of the
Navy, Defendant–Appellee,

and

Frank B. Kelso, II, Admiral, Acting
Secretary, U.S. Department of
the Navy, Defendant.

No. 95–2582.

United States Court of Appeals,
Fourth Circuit.

Argued May 10, 1996.

Decided Aug. 26, 1996.

**ARGUED:** Susan L. Dolin, Muchnick, Wasserman & Dolin, Hollywood, Florida, for Appellant. Kathleen O'Connell Gavin, Assistant United States Attorney, Baltimore, Maryland, for Appellee. **ON BRIEF:** Solaman G. Lippman, Lippman & Associates, Washington, D.C., for Appellant. Lynne A. Bat-

taglia, United States Attorney, Baltimore, Maryland, for Appellee.

Before RUSSELL and LUTTIG, Circuit Judges, and CHAPMAN, Senior Circuit Judge.

Affirmed by published opinion. Senior Judge CHAPMAN wrote the opinion, in which Judge RUSSELL and Judge LUTTIG joined.

## OPINION

CHAPMAN, Senior Judge:

Appellant Francisco B. Becerra brought this Title VII action in the District Court for the District of Maryland. Becerra, a former civilian employee of the United States Navy, alleged that the Navy discriminated against him on the basis of sex and national origin. He also alleged that the Navy retaliated against him after he filed his EEO complaints by revoking his security clearance. The Navy moved for partial summary judgment claiming that the decision to revoke Becerra's security clearance was not subject to judicial review. The district court granted this motion. The defendants then moved for summary judgment as to plaintiff's other claims arguing that he failed to produce any evidence of discriminatory intent. The district court granted this motion. We affirm.

### I.

Becerra began working for the Navy on September 12, 1983 as a civilian employee in the Office of Naval Intelligence ("ONI"), headquartered in Suitland, Maryland. Becerra, a United States born Hispanic, was fluent in several languages and had experience in military intelligence. He was an emigre debriefer for Task Force 168, a section of ONI, which is engaged in human source intelligence collection worldwide.

In August, 1984, Commander David Muller was appointed operations officer of Task Force 168 and also commander of the smaller Task Group 168.0, a division within Task Force 168 involved in domestic human intelligence gathering. As commander of Task Group 168.0, Commander Muller set up new field offices across the United States. Because of Becerra's fluency in Spanish and his familiarity with the Hispanic community, Muller chose Becerra to head the Miami, Florida office.

Maria Pallas was also a civilian employee of Task Force 168. She was hired as a Polish linguist, but rapidly advanced, eventually reaching the position of Overt Program Manager of Human Intelligence. Becerra alleged that Pallas traded sexual favors with her superiors, especially Muller and Captain Roland Saenz, commander of Task Force 168, to achieve her success.

Muller's duties as both commander of Task Group 168.0 and operations officer of Task Force 168 became burdensome, and to give him some relief, the position of Deputy Commander of Task Group 168.0 was created and Pallas was named to this position. Muller soon realized that he could not remain commander of Task Group 168.0 and also fulfill his duties as operations officer of Task Force 168. The Navy was unable to provide an active duty military officer to fill the 168.0 position, and Captain Saenz decided to create the entirely new position of Supervisory Intelligence Specialist CTG 168.0, which could be held by a civilian, to head the Task Group's activities.

On July 1, 1988, Pallas entered this new position, replacing Muller as commander of Task Group 168.0. Pallas was detailed to the position, i.e., her appointment was temporary until this new position could be competed and a suitable candidate hired. Becerra maintains that no employees were informed that the position was temporary and that it would later be competed. He claims that the Navy had no intention of opening the position to competition until he complained. However, the personnel office at ONI issued a Notice of Personnel Action, the mechanism by which Pallas was transferred to the position, two months before Becerra made his first complaint. That document clearly indicated that Pallas was detailed to the position for a period not to exceed 120 days.

Saenz and Pallas visited Miami in early August, 1988. During the visit, Saenz, Pallas, and Becerra visited a local, high-ranking official. Becerra did not wear a coat and

tie but instead wore a guayabera, an open-necked shirt often worn in the Hispanic community and, according to Becerra, acceptable business attire in Miami. After returning to Maryland, Pallas sent Becerra a letter pointing out problems that she had noticed on her visit. The letter covered the office's production, collections, personnel, telephone bills, and Becerra's personal appearance and professional etiquette. Pallas mentioned Becerra's style of dress, stating "I recommend you wear a jacket and tie when calling on the Admiral or the Chief of Staff (Coast Guard). Miami is casual, but this still is a military organization."

After receiving this letter, Becerra, who was unhappy with its contents, talked to Captain Saenz about it. The two met briefly at Dulles Airport on September 14, 1988 to discuss it. Saenz then arranged a meeting on October 14, 1988 with himself, Pallas, Becerra, and a representative from the human resources department. In this meeting, Becerra expressed concerns about Pallas' managerial skills. Pallas and Becerra then met alone and emerged with the understanding that they were going to move on and work together. In his monthly report following this meeting, Becerra reported the meeting and stated that he and Pallas had agreed to disagree. He sent this report, via the Task Force's messaging system, to the entire Task Force.

Captain Lesley, second-in-command of the Task Force, contacted Pallas after reading Becerra's message. He told Pallas that he considered Becerra's comments insubordinate and inappropriate and recommended that she restrict Becerra's message authority. After this, Pallas ordered Becerra to send all messages through headquarters and not to the entire Task Unit. Any message that needed to be forwarded to other individuals would be relayed through headquarters. Becerra claims that this restriction effectively shut his operation down.

On September 28, 1988, the Navy announced the vacancy for the position of commander of the Task Group, the position that Pallas was temporarily holding. After this announcement, Becerra sent a message to headquarters requesting clarification of the vacancy announcement because he felt that Pallas had been preselected for the position. Saenz replied that Pallas had been detailed to the position and that "[a]ll qualified applicants will be considered by a selection board."

Thirteen candidates applied for the position. A panel was selected to review the application packages, pick out the best qualified, and then rank them numerically for Captain Saenz, the selecting official. The panel chose four finalists. The panel gave Pallas a perfect score of 56 and Becerra the second highest score of 55. Captain Saenz, relying on the panel's scores, the application packages, and his knowledge of the individual candidates, chose Pallas for the position.

Becerra claims that this selection was tainted in several ways. First, one of the panel members was Pallas' close friend; second, Muller, who Becerra claims was receiving sexual favors from Pallas lobbied Saenz on behalf of Pallas; third, Muller was the officer that drew up the crediting plan for the position. This crediting plan listed the experience criteria, and Becerra claims that it was tailored to match Pallas' experience.

Saenz testified that he found that Pallas was the superior candidate. He also testified that he did not believe that any of the other three finalists were qualified to fill the position, and that he would have recompeted the position rather than select one of those three.

After Pallas' appointment to the position, Becerra attempted to telephonically file an EEO complaint. He was told that he must travel to Washington to file a complaint in person, which he did. Becerra claims that the Navy retaliated against him because of his filing the EEO complaint in the following ways: Pallas' second-in-command told him that he better find another job, Pallas would not allow him time to process his complaint until she was told that she must, employees of Task Force 168 were instructed to provide headquarters with whatever negative details they could find on Becerra, and Pallas threatened to file an EEO complaint against him.

In November, 1988, the Navy began a security investigation on Becerra based on confidential information that Becerra claims the Navy knew or should have known was false. Becerra's security clearance was suspended on January 5, 1989. He was placed on administrative leave pending further investigation. On October 24, 1989, the Navy discharged Becerra based on his lack of security clearance. He appealed his discharge to the Merit Systems Protection Board which ordered Becerra reinstated to his position. The Navy discharged Becerra again on July 6, 1990; this prompted him to file his second EEO complaint on August 16, 1990.

■ More than two years later, Becerra discovered a "wanted" poster in his mailbox with him as the subject. He claims that the poster was on Navy paper and sent through government mails. This poster was derogatory and mentions his Hispanic heritage.

The district court granted partial summary judgment for the defendant as to the claim of retaliation based upon defendant's instigation of a security clearance investigation relying upon the Supreme Court's decision in *Department of the Navy v. Egan,* 484 U.S. 518, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988), and our more recent decision in *Guillot v. Garrett,* 970 F.2d 1320 (4th Cir.1992). In granting summary judgment for defendant as to the claim of gender discrimination and national origination discrimination, the Court held that plaintiff's allegations of sex discrimination based upon the alleged favoritism bestowed upon Pallas as a result of her alleged sexual relationships with Captain Saenz and Commander Muller could not stand in light of *DeCintio v. Westchester County Medical Center,* 807 F.2d 304 (2d Cir.1986), *cert. denied,* 484 U.S. 825, 108 S.Ct. 89, 98 L.Ed.2d 50 (1987), and *Autry v. North Carolina Department of Human Resources,* 820 F.2d 1384 (4th Cir.1987), which held that a voluntary ongoing friendship or relationship was not a proper basis for a Title VII suit. As to the claim of national origin discrimination, the Court found that the plaintiff could not carry the burden of making out a prima facie case of discrimination and pointed out that the plaintiff, a Hispanic, was claiming discrimination based on national origin by Cap-

tain Saenz, another Hispanic. As to the other claims of retaliation, the Court found that plaintiff's various allegations as to retaliatory acts did not constitute "adverse employment action within the meaning of Title VII."

## II.

■ This court reviews a grant of a motion to dismiss and a grant of summary judgment *de novo. Austin v. Owens–Brockway Glass Container, Inc.,* 78 F.3d 875, 877 (4th Cir.1996); *Lone Star Steakhouse and Saloon, Inc. v. Alpha of Va., Inc.,* 43 F.3d 922, 929 n. 9 (4th Cir.1995).

■ Becerra claims that the instigation of the security check that eventually led to the revocation of his security clearance and the loss of his job was impermissible retaliation for filing his EEO complaints. Relying on *Department of the Navy v. Egan,* 484 U.S. 518, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988), and *Guillot v. Garrett,* 970 F.2d 1320 (4th Cir. 1992), the district court held that it lacked subject matter jurisdiction to review the merits of the Navy's decision to investigate the plaintiff or its ultimate security clearance decision. We agree.

In *Egan,* the Supreme Court held that the Merit Systems Review Protection Board did not have the authority to review the substance of an underlying decision to deny or revoke a security clearance. Security clearances are within the Executive's purview, and therefore, "unless Congress specifically has provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs." *Id.* at 530, 108 S.Ct. at 825.

■ In *Guillot,* the Fourth Circuit, relying on *Egan,* held that a court could not review security clearance decisions for violations of the Rehabilitation Act of 1973. The claimant in *Guillot* lost his security clearance following a periodic security investigation. He argued that the Navy's decision to revoke his clearance discriminated against him on the basis of his alleged handicap due to alcoholism and drug abuse. The Fourth Circuit restated the Court's mandate in *Egan:* " 'un-

less Congress *specifically* has provided otherwise,' the courts will not intrude upon the President's authority to grant or deny access to national security information." *Guillot*, 970 F.2d at 1324. In analyzing the Rehabilitation Act for a specific provision of Congress allowing intrusion on the Executive power, the court stated:

> [None] of these provisions otherwise evidence the kind of unmistakable expression of purpose that the Supreme Court by necessary implication suggested in *Egan* would be required to support a conclusion that Congress intended to subject the Executive's security clearance determinations to scrutiny for violations of either section 501 of the Rehabilitation Act of 1973 or Title VII itself.

*Id.* at 1325. We agree that there is no unmistakable expression of purpose by Congress in Title VII to subject the decision of the Navy to revoke Becerra's security clearance to judicial scrutiny.

Becerra attempts to distinguish his case by arguing that no court has addressed the issue of whether the *instigation* of the investigation into the security clearance as a form of retaliation is judicially reviewable. We find that the distinction between the initiation of a security investigation and the denial of a security clearance is a distinction without a difference. The question of whether the Navy had sufficient reasons to investigate the plaintiff as a potential security risk goes to the very heart of the "protection of classified information [that] must be committed to the broad discretion of the agency responsible, and this must include broad discretion to determine who may have access to it." *Egan*, 484 U.S. at 529, 108 S.Ct. at 825. The reasons why a security investigation is initiated may very well be the same reasons why the final security clearance decision is made. Thus, if permitted to review the initial stage of a security clearance determination to ascertain whether it was a retaliatory act, the court would be required to review the very issues that the Supreme Court has held are non-reviewable.

### III.

■ Becerra next argues that he was the victim of sexual discrimination and sexual harassment. Becerra claims that there is evidence of a sexually hostile environment wherein Pallas was trading sexual favors for promotional opportunities to Becerra's career detriment. Becerra relies on 29 C.F.R. § 1604.11(g) to establish this definition of sexual harassment:

> Other related practices: Where employment opportunities or benefits are granted because of an individual's submission to the employer's sexual advances or requests for sexual favors, the employer may be held liable for unlawful sex discrimination against other persons who are qualified but denied that employment opportunity or benefit.

The district court relied on *DeCintio v. Westchester County Medical Center*, 807 F.2d 304 (2d Cir.1986), *cert. denied*, 484 U.S. 825, 108 S.Ct. 89, 98 L.Ed.2d 50 (1987), one case in a line of cases that holds that an employer who promotes his lover or paramour, or otherwise accords the lover or paramour preferential treatment, is not liable for sexual harassment under Title VII. In *DeCintio*, the male plaintiffs claimed discrimination when a female who was engaged in a sexual relationship with the selecting official was promoted over them. The Second Circuit held that promotion of a paramour does not violate Title VII:

> [The selecting official's] conduct, although unfair, simply did not violate Title VII. [The plaintiffs] were not prejudiced because of their status as males; rather, they were discriminated against because [the selecting official] preferred his paramour. [The plaintiffs] faced exactly the same predicament as that faced by any woman applicant for the promotion: No one but [the paramour] could be considered for the appointment because of [the paramour's] special relationship to [the selecting official].

*Id.* at 308. The Fourth Circuit has cited *DeCintio* in holding that promotion of a friend and political ally is not racial discrimination under Title VII. *Autry v. North Carolina Dept. of Human Resources*, 820 F.2d 1384 (4th Cir.1987).

We find that even accepting as true the fact that the commanding officer was accepting sexual favors from Pallas, this conduct does not amount to sexual discrimination against Becerra under Title VII.

### IV.

Citing Pallas' letter concerning his style of dress and citing the facts that the position was preselected and that he was assigned to the Miami office, Becerra claims that he suffered national origin discrimination. We find these claims totally lacking in merit. Also, Becerra's receipt of the wanted poster was too far removed to constitute discrimination. We agree with the district court that appellant did not present a prima facie case of national origin discrimination or of retaliation.

For the forgoing reasons, the decision of the district court is

*AFFIRMED.*