**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 21-2022**

---

NATHAN MOWERY,

        Plaintiff - Appellant,

   v.

NATIONAL GEOSPATIAL-INTELLIGENCE AGENCY; WILLIAM BURNS, Director
of the Central Intelligence Agency,

        Defendants - Appellees.

---

Appeal from the United States District Court for the Eastern District of Virginia, at
Alexandria. T. S. Ellis, III, Senior District Judge. (1:21−cv−00226−TSE−TCB)

---

Argued: March 8, 2022                    Decided: August 2, 2022

---

Before KING, WYNN, and RUSHING, Circuit Judges.

---

Affirmed by published opinion. Judge Wynn wrote the opinion, in which Judge King and
Judge Rushing joined.

---

**ARGUED:** Christina A. Jump, CONSTITUTIONAL LAW CENTER FOR MUSLIMS
IN AMERICA, Richardson, Texas, for Appellant. Rebecca Sara Levenson, OFFICE OF
THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellees. **ON
BRIEF:** Alyssa F. Morrison, Charles D. Swift, Director, CONSTITUTIONAL LAW
CENTER FOR MUSLIMS IN AMERICA, Richardson, Texas, for Appellant. Jessica D.
Aber, United States Attorney, Richmond, Virginia, Catherine M. Yang, Assistant United
States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria,
Virginia, for Appellees.

---

WYNN, Circuit Judge:

In *Department of the Navy v. Egan*, 484 U.S. 518 (1988), the Supreme Court held that "the grant [or denial] of [a] security clearance to a particular employee" "must be committed to the broad discretion of the [executive] agency responsible." 484 U.S. at 527, 529.

In this appeal, Plaintiff Nathan Mowery sued the National Geospatial-Intelligence Agency and the Director of the Central Intelligence Agency alleging religious discrimination and retaliation under Title VII. Because the alleged discrimination and retaliation arose from his failure to satisfy additional security requirements and would require the court to review the merits of the security-authorization decision, we are bound by *Egan* to affirm the district court's dismissal of this matter for lack of jurisdiction.

I.

A.

The facts taken from Mowery's complaint as well as other submitted materials show that in 2014, Mowery, a U.S. Army combat veteran and Bronze Star recipient, began working as a contractor for the National Geospatial-Intelligence Agency ("Geospatial Agency"). That position required a "Top Secret security clearance with Sensitive Compartmented Access approval," which Mowery obtained in 2014. J.A. 24.[1] Mowery's level of clearance granted him "Staff-Like Access" to "necessary government

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

information." Opening Br. at 4. However, the "vetting process" for this security clearance did not require a psychological evaluation. J.A. 11.

In November 2016, the Geospatial Agency extended a conditional offer to employ Mowery as an assignee[2] with the Central Intelligence Agency ("CIA"). That position involved similar duties to his prior contractor role but offered "more job security and associated benefits." J.A. 8. However, the offer was conditioned on Mowery's satisfaction of the CIA's additional personnel security requirement, which was separate from, and in addition to, the clearance Mowery held for his contractor position.

Specifically, Mowery was required to complete a 500-question form and undergo a medical examination, like all CIA assignees, which included a psychological evaluation. While the assignee processing was underway, Mowery's system access was temporarily suspended.

During Mowery's evaluation, a CIA psychologist asked him whether he consumed alcohol.[3] He replied that he had not had a drink in the last two years due to his "religious views" and conversion to Islam. J.A. 11. Thereafter, the psychologist asked Mowery

---

[2] According to Defendants, "CIA assignees and detailees are federal employees of other government agencies," like the Geospatial Agency, "who have been designated (typically for a certain period of time) to work for the CIA." Memorandum of Defendants in Support of Motion to Dismiss at 4 n.3, *Mowery v. Nat'l Geospatial Intel. Agency*, 550 F. Supp. 3d 303 (E.D. Va. 2021) (No. 1:21-cv-00226-TSE-TCB), Dkt. No. 18. By contrast, "CIA staff are individuals directly hired and employed by the agency." *Id.*

[3] The district court took judicial notice of the fact that questions about alcohol consumption are a "standard part of the general security clearance assessment." *Mowery*, 550 F. Supp. 3d at 307 n.5. Neither party has challenged that finding on appeal.

3

various questions about his faith and his personal religious practice. Mowery's religious beliefs were discussed in greater detail than any other topic. In investigative affidavits collected by the Geospatial Agency, several other applicants confirmed that "they either definitively were <u>not</u> asked about religion in their own mental health evaluations, or d[id] not recall being asked about religion during their mental health evaluations." J.A. 15.

On May 17, 2017, several months after his psychological exam, Mowery received the following email from the CIA:

> Good Morning Mr. Mowery,
>
> Unfortunately, we have determined that we can no longer continue your assignee processing. The determination was based on information you provided us or was otherwise obtained during your Staff-Like Access processing. There is no appeal regarding this decision nor will additional information be provided.
>
> Please note that this email does not represent a security clearance denial for a National Security position. When filling out future National Security Questionnaires—Standard Form 86 (SF-86) application forms and related documents, you should note that **you were not denied** a security clearance for this application.
>
> Please inform your [Department of Defense] Program Manager. We also ask that [the Department of Defense] inform the appropriate CIA Component, Mission Center, or Directorate of this decision.
>
> Thank you.

J.A. 76.

On June 9, 2017, a CIA liaison informed a Geospatial Agency security official that Mowery's "clearance processing was halted due to a failed mental health evaluation" and that his "security packet was not the issue." J.A. 12. An investigative affidavit further

4

confirmed that Mowery failed to pass "the medical component of his onboarding." J.A. 15.

Without the additional security authorization, Mowery was unable to start the CIA-assignee position. On July 24, 2017, Mowery's badge was deactivated, and he was removed from his contractor position since it was located at a CIA worksite that he was no longer authorized to access due to the failed mental health evaluation. Instead of terminating Mowery, however, the Geospatial Agency transferred him to a staff-officer desk located off the CIA worksite, "where he held little to no job responsibilities." J.A. 12. Two weeks later, Mowery accepted a different government contractor position which allowed him to use his original, Staff-Like-Access security clearance. This new position permitted him to access the "same data" and "perform[] substantially similar duties as he would have . . . had his [CIA assignee] security clearance been completed." J.A. 13.

Mowery subsequently filed formal complaints with the Geospatial Agency and CIA alleging constructive discharge due to religious discrimination. Both agencies found that Mowery had failed to state a claim. Mowery appealed the decisions to the U.S. Equal Employment Opportunity Commission, which affirmed the Geospatial Agency's decision and dismissed Mowery's claims against the CIA.

B.

In 2020, Mowery filed this lawsuit in federal district court against the Geospatial Agency and the CIA. His complaint alleged that the May 17, 2017, email stating that his security assessment would be "halted" was "an effective denial of security clearance." J.A. 12. Based on this, Mowery asserted two claims against each Defendant under Title

5

VII of the Civil Rights Act of 1964, alleging that the Geospatial Agency and CIA (1) discriminated against him due to his faith, leading to his inability to start the CIA-assignee position and his constructive discharge from his contractor position, and (2) denied him future staff positions in retaliation for complaining about said discrimination and for filing an Equal Employment Opportunity complaint. For relief, he sought clearance of any negative records from his file, lost wages, compensatory damages for emotional distress, punitive damages, attorney's fees, and an order enjoining Defendants from discriminating based on religious beliefs.

Defendants moved to dismiss for lack of subject-matter jurisdiction, claiming that the Supreme Court's decision in *Department of the Navy v. Egan* and its progeny clearly established that courts have no jurisdiction to review adverse employment actions resulting from security-clearance decisions. The district court agreed that it lacked jurisdiction under *Egan* and dismissed the case without prejudice under Federal Rule of Civil Procedure 12(b)(1).[4] *Mowery v. Nat'l Geospatial Intel. Agency*, 550 F. Supp. 3d 303, 312 (E.D. Va. 2021). Mowery timely appealed.

---

[4] In a footnote, the district court further held that 42 U.S.C. § 2000e-2(g) "independently preclude[d] judicial review of [Mowery]'s Title VII claims" and required dismissal. *Mowery*, 550 F. Supp. 3d at 310 n.10. Section 2000e-2(g) provides that "it shall not be an unlawful employment practice for an employer to fail or refuse to hire and employ . . . [or] to discharge any individual from any position," if the individual fails to fulfill a requirement "imposed in the interest of the national security of the United States under any security program in effect pursuant to or administered under any statute of the United States or any Executive order of the President." 42 U.S.C. § 2000e-2(g). Because we affirm on the basis of *Egan*, we do not reach this alternative ground. However, we note that we have previously suggested this provision applies only to *private* employers. *See Guillot v. Garrett*, 970 F.2d 1320, 1326 (4th Cir. 1992), *as amended* (July 23, 1992);

II.

"We review de novo a district court's dismissal of a complaint for lack of subject matter jurisdiction." *Campbell v. McCarthy*, 952 F.3d 193, 202 (4th Cir. 2020). "Generally, when a defendant challenges subject matter jurisdiction via a Rule 12(b)(1) motion to dismiss, the district court may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment."[5] *Velasco v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004); *see Saval v. BL Ltd.*, 710 F.2d 1027, 1029 n.2 (4th Cir. 1983) ("As to motions to dismiss under Rule 12(b)(1), courts may consider affidavits and other extrinsic information to determine whether subject matter jurisdiction exists."); *Blitz v.*

---

*see also* 42 U.S.C. § 2000e(b) (defining "employer" for purposes of most of § 2000e to exclude the United States Government); 42 U.S.C. § 2000e-16 (providing employment protections for federal employees, without mentioning a national security exception).

[5] The district court appears to have construed Defendants' Rule 12(b)(1) motion as a *factual* challenge to subject-matter jurisdiction, *Mowery*, 550 F. Supp. 3d at 304–05, 304 n.2, 305 n.3, which "provid[es] the trial court the discretion to 'go beyond the allegations of the complaint and in an evidentiary hearing determine if there are facts to support the jurisdictional allegations,'" *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017) (quoting *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009)); *see id.* (explaining the difference between factual and facial subject-matter-jurisdiction challenges). No party objected to the district court's categorization or decision to look at evidence outside of the pleadings. *Mowery*, 550 F. Supp. 3d at 304–05 n.2. Nor has Mowery clearly raised any such argument on appeal. "A party waives an argument by failing to present it in its opening brief or by failing to 'develop [its] argument—even if [its] brief takes a passing shot at the issue.'" *Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) (some quotation marks omitted) (quoting *Brown v. Nucor Corp.*, 785 F.3d 895, 923 (4th Cir. 2015) (Agee, J., dissenting)). Mowery has therefore waived any objection to the consideration of such evidence.

7

*Napolitano*, 700 F.3d 733, 736 n.3 (4th Cir. 2012) (including declarations as extrinsic evidence that may be considered in evaluating a Rule 12(b)(1) motion). Dismissal should be granted "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Balfour Beatty Infrastructure, Inc. v. Mayor of Balt.*, 855 F.3d 247, 251 (4th Cir. 2017) (quoting *Evans v. B.F. Perkins Co., a Div. of Standex Int'l Corp.*, 166 F.3d 642, 647 (4th Cir. 1999)).

### III.

On appeal, Mowery argues that *Egan* does not require dismissal under the particular facts at issue here. In the alternative, he asks this Court to remand the case with instructions to grant him leave to amend his complaint to "include constitutional claims as this Court may deem appropriate." Opening Br. at 33. For the reasons discussed below, we affirm the district court's dismissal under *Egan* and deny Mowery's request for a remand.

### A.

In *Egan*, the Supreme Court held that "the grant [or denial] of [a] security clearance to a particular employee" "must be committed to the broad discretion of the [executive] agency responsible." 484 U.S. at 527, 529. Because the grant or denial of a security clearance involves an agency's "[p]redictive judgment" about "whether, under compulsion of circumstances or for other reasons, [an individual] might compromise sensitive information," review by an "outside nonexpert body"—like a federal court— would be inappropriate under general separation-of-powers principles. *Id.* at 528–29.

8

Thus, "absent a specific mandate from Congress providing otherwise, federal courts are generally without subject-matter jurisdiction to review an agency's security clearance decision." *Hegab v. Long*, 716 F.3d 790, 794 (4th Cir. 2013). And this Court has "never discerned an 'unmistakable expression of purpose by Congress in Title VII [of the Civil Rights Act of 1964]' to subject security clearance decisions 'to judicial scrutiny.'" *Campbell*, 952 F.3d at 203 (quoting *Becerra v. Dalton*, 94 F.3d 145, 149 (4th Cir. 1996)). Consequently, "a claim that an adverse employment decision violated a plaintiff's statutory rights is unreviewable when it 'necessarily depends upon a review of' an agency's security clearance decision." *Id.* at 205–06 (quoting *Guillot v. Garrett*, 970 F.2d 1320, 1326 (4th Cir. 1992)).

Mowery concedes that *Egan* precludes judicial review of agency *decisions* which "involve the revocation, suspension[,] or denial of a security clearance." Opening Br. at 17. Such decisions, he recognizes, necessarily "involve[] the exercise of predictive judgment." *Id.* at 19. However, he argues that no "decisions" or "predictive judgment[s]" were made here; "instead the [CIA] simply refused to complete the [assignee] process[ing]." *Id.* at 17, 19–20. Finding that *Egan* extends to such non-decisions, he continues, would leave him with "no recourse" because it would allow the agencies to dodge judicial review and avoid internal administrative appeals. *Id.* at 25. For the reasons

9

explained below, we disagree and hold that *Egan* bars judicial review of Mowery's Title VII claims.[6]

1.

We turn first to Mowery's argument that *Egan* does not apply to the situation at hand since the CIA's decision to "no longer continue" his assignee processing was not a true denial of a security clearance. *Id.* at 20–24. This argument rests on two premises. First, Mowery claims *Egan* cannot be extended beyond security clearances to cover the CIA's personnel security requirements at issue in this case. Even if it did, he secondly argues *Egan*'s "reach does not properly extend beyond the *grant, denial[,] or revocation*" of such a security authorization. *Id.* at 21 (emphasis added). Neither premise holds water.

i.

To the extent Mowery argues that *Egan* can only ever apply to technical security-clearance decisions,[7] and not to other similar national-security-authorization decisions

---

[6] The district court's jurisdictional analysis did not clearly distinguish between Mowery's discrimination and retaliation claims. *See Mowery*, 550 F. Supp. 3d at 309. Mowery's briefing before this Court focuses almost entirely on his discrimination claims. As he makes no separate argument as to why *Egan* should not bar review of his retaliation claims, Mowery has waived any such argument. *See Grayson O Co.*, 856 F.3d at 316.

[7] Mowery's position on this particular point has been less than consistent. And we note that Mowery's complaint and briefing before this Court repeatedly refer to the CIA's additional security requirement as a "security clearance." *E.g.*, J.A. 11–13 (complaint referring to the assignee processing as a "security clearance assessment" and stating that the failure to complete the process resulted in an "effective denial of security clearance"); Reply Br. at 4 (stating that Defendants "neither granted nor denied . . . Mowery's security clearance for his intended new role"). However, since Defendants concede that the CIA's

10

involving predictive judgments and implicating the concerns discussed in *Egan*, we disagree. And we are not alone.

For example, in *Foote v. Moniz*, the D.C. Circuit extended *Egan* to bar judicial review of adverse employment actions where such a review would require evaluating the Department of Energy's denial of a Human Reliability Program certificate. 751 F.3d 656, 657–59 (D.C. Cir. 2014). The Human Reliability Program "carefully evaluates employment applicants for certain positions, such as those where the employees would have access to nuclear devices, materials, or facilities." *Id.* at 657. To obtain a certificate, applicants needed to satisfy several requirements, including "passing a psychological evaluation, passing random drug tests, annually submitting an SF–86 Questionnaire for National Security Positions, and successfully completing a counterintelligence evaluation that includes a polygraph examination." *Id.* The D.C. Circuit recognized that this certification was not precisely the same as a security clearance, since "an applicant seeking certification under the Human Reliability Program must already possess or obtain . . . the Department of Energy's highest level of security clearance," but reasoned that it was still a "similar kind of predictive national security judgment" to that in *Egan*. *Id.* at 658–59.

The Tenth Circuit followed suit in *Sanchez v. United States Department of Energy* and held that the revocation of a Human Reliability Program certification "was a

additional security requirement for assignees is not technically a security clearance, we assume for purposes of this opinion that it is not.

11

security-clearance decision" under *Egan*. 870 F.3d 1185, 1193 (10th Cir. 2017). In reaching this conclusion, the Tenth Circuit asked whether the certification involved the same "security-clearance characteristics" as *Egan*. *Id.* These characteristics included whether (1) the agency derived its authority from the President's Article II authority; (2) the decision implicated national security concerns; and (3) the decision "involve[d] predictions about someone's future conduct." *Id.* Because the certification involved these characteristics, the court found that *Egan* insulated certification decisions from review. *Id.* at 1193–94.

As these summaries make clear, *Foote* and *Sanchez* focused not on whether the decision at issue was technically labeled a security-clearance determination, but on whether the decision involved the same sort of executive authority, predictive judgments, and underlying national-security concerns at issue in *Egan*. *See Foote*, 751 F.3d at 658–59; *Sanchez*, 870 F.3d at 1192–94; *see also Kaplan v. Conyers*, 733 F.3d 1148, 1151–52, 1163–66 (Fed. Cir. 2013) (en banc) (focusing on the nature of predictive judgments and the existence of national-security concerns and finding that *Egan* was not limited to "actions involving security clearance determinations" but extended to review of "determinations concerning eligibility of an employee to occupy a [Department of Defense] 'sensitive' position, regardless of whether the position requires access to classified information"). Although the Supreme Court in *Egan* only addressed the "narrow question" of security clearances, our sister circuits' approach corresponds with other language in the *Egan* decision recognizing the "Government's 'compelling interest' in withholding national security information from unauthorized persons" and observing

12

that "[p]redictive judgment[s] of this kind must be made by those with the necessary expertise in protecting classified information." *Egan*, 484 U.S. at 520, 527, 529.

Mowery counters that several Circuits have declined to expand *Egan* to cover other types of security authorizations. But those decisions are distinguishable because the authorizations at issue lacked the kind of discretionary predicative judgment involved in *Egan*. For example, in *Toy v. Holder*, the Fifth Circuit declined to extend *Egan* to the mere revocation of building access by a supervisor. 714 F.3d 881, 885–86 (5th Cir. 2013). The court noted that "[s]ecurity clearances are different from building access" and stressed that the decision lacked the predictive judgment, considered decision-making, specialized decision-makers exercising powers "delegated by the President to agency heads or their designees," and process present in *Egan*. *Id.* at 885 & n.6.[8]

Similarly, in *Hale v. Johnson*, the Sixth Circuit refused to "extend *Egan* to preclude judicial review of an agency's determination regarding an employee's physical capability" to perform their duties at a nuclear plant.[9] 845 F.3d 224, 231 (6th Cir. 2016). But the court noted that a physical-fitness determination "is based on hard science"— which "has historically been reviewed by courts and administrative agencies"—making it

---

[8] *See also Eghbali v. Dep't of Energy at Savannah River Nat'l Lab*, 90 F. Supp. 3d 587, 593–95 (D.S.C.) (relying on *Toy* and declining to extend *Egan* to bar review of the plaintiff's Title VII claim where the plaintiff's job required no security clearance and the Department of Energy denied him physical access to the Savannah River Site), *aff'd*, 623 F. App'x 115 (4th Cir. 2015) (per curiam).

[9] Specifically, in *Hale*, the employer discharged the employee "for failing a pulmonary function test," which was "a requirement imposed by the [employer] for employees to maintain their necessary medical clearance." *Hale*, 845 F.3d at 226.

13

distinguishable from the predictive judgments regarding "an individual's propensity to compromise sensitive information" covered by *Egan*. *Id.* at 230–31. Indeed, the Sixth Circuit declined to "create a *per se* rule that *Egan* can never apply outside of the context of security clearances," instead cabining its decision to "physical-fitness judgments" like the one at issue in that case. *Id.* at 230. By contrast, as opposed to the "hard science" of physical fitness, "[t]he attempt to define not only the individual's future actions, but those of outside and unknown influences renders the grant or denial of security clearances . . . *an inexact science at best*." *Egan*, 484 U.S. at 529 (emphasis added) (internal quotation marks omitted).

Lastly, Mowery's reliance on the D.C. Circuit's decision in *Rattigan v. Holder* is similarly unpersuasive. 689 F.3d 764 (D.C. Cir. 2012). First, the facts are inapposite, as the D.C. Circuit found that it could review a Title VII claim based on the knowingly false referral of an officer without the authority to make security-clearance decisions that led to a security-clearance investigation. *Id.* at 767–70. Moreover, *Rattigan* is in some tension with this Court's holding in *Becerra*. *See Kruise v. Fanning*, 214 F. Supp. 3d 520, 526 (E.D. Va. 2016) ("Clearly, the *Becerra* decision forecloses plaintiff's attempt to wiggle out from under *Egan* by relying on *Rattigan*'s holding[.]"), *aff'd sub nom. Kruise v. Speer*, 693 F. App'x 213 (4th Cir. 2017) (per curiam). *Compare Rattigan*, 689 F.3d at 768 ("*Egan*'s absolute bar on judicial review covers only security clearance-related decisions made by trained Security Division personnel and does not preclude all review of decisions by other FBI employees who merely report security concerns."), *with Becerra*, 94 F.3d at 149 ("We find that the distinction between the initiation of a security

14

investigation and the denial of a security clearance is a distinction without a difference."), *and Rattigan*, 689 F.3d at 774 (Kavanaugh, J., dissenting) ("The majority opinion's slicing and dicing of the security clearance process into reviewable and unreviewable portions is nowhere to be found in *Egan*[.]").

We agree that courts must exercise caution in expanding the reach of *Egan*. Nevertheless, we decline to adopt the hardline position, urged by Mowery, that *Egan*'s rationale may only ever apply to determinations explicitly labeled "security clearances." Rather, as in *Foote* and *Sanchez*, this case requires a more detailed analysis of whether the judgment at issue is of the type that *Egan* intended to shield from judicial review.

ii.

Mowery contends that even if *Egan* can extend past those processes explicitly labeled as security clearances, its jurisdictional bar only applies to the "affirmative suspension, revocation[,] or denial" of a security authorization. Opening Br. at 18. And since the CIA "merely 'halt[ed]'" his security processing and expressly said it was not "den[ying]" any security clearance in its letter, he argues, the agency "refus[ed] to make a decision" or "predictive judgment" that *Egan* would protect from judicial review. Reply Br. at 4 (emphasis omitted).

This argument contains three related but distinct assertions: (1) that the CIA failed to make any kind of decision when it ceased Mowery's security-authorization processing; (2) that, even if there was a decision, *Egan* cannot shield it since it was not a true suspension, revocation, or denial; and (3) that, even if *Egan* would otherwise prevent our review, it does not apply in this case because the CIA did not make any predictive

15

judgment when it discontinued Mowery's security processing. We consider, and reject, each contention in turn.

a.

From the outset, we note that even if we accept Mowery's contention that the agency's email did not constitute an official denial, it still clearly communicated a decision. The email itself stated that "we have *determined* that we can no longer continue your assignee processing" and that this "*determination*" was based on information gained during Mowery's processing. J.A. 76 (emphases added). It further instructed the Department of Defense to "inform the appropriate CIA Component, Mission Center, or Directorate of this *decision*." J.A. 76 (emphasis added). Mowery himself acknowledged in his complaint that the "language was . . . clear that the Agency intended no further action to complete the clearance assessment, *rendering it an effective denial* of security clearance." J.A. 12 (emphasis added). And, because of the "halting" of his processing, Mowery did not meet the requirements for the CIA assignee position he had been conditionally offered, though he was allowed to reapply for the position in a year. J.A. 18. Thus, although Mowery insists that this language does not amount to a technical denial, it at least demonstrates a clear decision not to grant Mowery the additional, assignee-security authorization at that time.

b.

Having determined that a decision was made, we must next determine what sorts of decisions *Egan* applies to. Mowery argues that *Egan* only covers black-and-white

16

denials, suspensions, and revocations of security authorizations. However, this Court already rejected a similar argument in *Becerra v. Dalton*. 94 F.3d at 149.

In that case, we repudiated the plaintiff's contention that the decision to *initiate an investigation* into an employee's security clearance was judicially reviewable even if the *final revocation* of it was not. *Id.* We explained that drawing a line between the initiation and completion of clearance proceedings would create a "distinction without a difference" since the "[t]he question of whether the [Government] had sufficient reasons to investigate the plaintiff as a potential security risk goes to the very heart of the 'protection of classified information [that] must be committed to the broad discretion of the agency responsible.'" *Id.* (quoting *Egan*, 484 U.S. at 529). We concluded that "if permitted to review the initial stage of a security clearance determination to ascertain whether it was a retaliatory act, the court would be required to review the very issues that the Supreme Court has held are non-reviewable" as the reasons for the investigation and final denial may be the same. *Id.*[10]

Read together, *Becerra* and *Egan* indicate that a security decision's label is not determinative. If Mowery was correct that a decision's label is all that matters, then

---

[10] *See also Murphy v. Sec'y, U.S. Dep't of Army*, 769 F. App'x 779, 782 (11th Cir. 2019) (explaining that the Eleventh Circuit has "extended *Egan* to apply not only to final denials or revocations of security clearances, but also to decisions made at the suspension or investigatory stage, determining that to review the initial stages of a security clearance determination is to review the basis of the determination itself regardless of how the issue is characterized"); *Panoke v. U.S. Army Mil. Police Brigade*, 307 F. App'x 54, 56 (9th Cir. 2009) ("A review of the circumstances surrounding a security clearance is tantamount to a review of the security clearance itself. Therefore, the circumstances surrounding the revocation of [plaintiff's] security clearance must be precluded from review.").

17

courts would be permitted to segment a security-authorization decision and review the early stages of the decision-making process while claiming not to review the end result. But as *Becerra* recognized, it is not possible to disentangle the early stages of a security assessment from the end result. After all, the "reasons why a security investigation is initiated may very well be the same reasons why the final security clearance decision is made." *Id.*; *cf. Hill v. Dep't of Air Force*, 844 F.2d 1407, 1411 (10th Cir. 1988) ("If the merits underlying a revocation cannot be examined, there are even stronger reasons why the merits underlying an interim action such as a suspension cannot be examined.").

c.

Consequently, instead of asking whether the CIA's decision to cease Mowery's additional security-authorization processing was a technical denial, we must ask whether its assessment involved the same kind of predictive judgment and national-security concerns underlying *Egan*. *Egan*, 484 U.S. at 526–30; *see Foote*, 751 F.3d at 658–59; *Sanchez*, 870 F.3d at 1193–94. We hold that it did.

In *Egan*, the Court explained that predictive judgments are a type of "judgment call" on the part of executive agencies. 484 U.S. at 529. Instead of simply "passing judgment upon an individual's character," these judgments "attempt to predict" an applicant's "possible future behavior and to assess whether, under compulsion of circumstances or for other reasons, [they] might compromise sensitive information." *Id.* at 528. Such an assessment involves an "attempt to define not only the individual's future actions" but also the possible impacts of "outside and unknown influences." *Id.* at 529.

18

We conclude that the CIA's decision to cease Mowery's additional security-authorization processing due to a failed mental-health evaluation fits this description. According to the CIA, the purpose of the psychological evaluation was to ensure that an applicant's employment was "clearly consistent with national security" and to evaluate an applicant's "reliability, trustworthiness, judgment, and ability to protect classified information." J.A. 24–25. A CIA liaison's affidavit states that this additional security requirement was required by CIA regulations and guided by the adjudicative standards laid out in Intelligence Community Policy Guidance 704.2. J.A. 24–25. And "[b]ased on . . . Mowery's psychological examination," the affidavit explains, a "CIA psychologist with the Office of Medical Support" "made the predictive assessment that, at that point in time, there were concerns with . . . Mowery's ability to meet" agency standards. J.A. 25.

We have little trouble in concluding that a psychological evaluation like this is *precisely* the type of predictive assessment protected by *Egan*. It is an "attempt" by the CIA "to predict [Mowery's] possible future behavior and to assess whether . . . he might compromise sensitive information."[11] *Egan*, 484 U.S. at 528. Like the denial of a security

---

[11] Mowery notes that the contractor position he accepted after his failed mental-health evaluation permitted him access to the same data and involved similar duties to the role he would have had as a CIA assignee. Opening Br. at 6. The potential implication seems to be that the evaluation was effectively not a security clearance, or a judgment about his ability to protect sensitive information, since he was able to gain access to the same information without it. But he does not develop this argument. Moreover, Mowery's counsel conceded at oral argument that the denial impacted Mowery's access to the worksite, systems, *and* information, and that the ultimate effect was the same as not having a security clearance. Oral Arg. at 19:15–20:45, 21:40–21:49, https://www.ca4.uscourts.gov/OAarchive/mp3/21-2022-20220308.mp3.

clearance in *Egan*, the CIA's decision to cease Mowery's processing due to the psychologist's concerns with his ability to meet agency standards is a "judgment call" that falls within the agency's broad discretion. *Id.* at 529. Therefore, while Mowery may believe that his evaluation was tainted by religious discrimination, we, as an "outside nonexpert body," have no authority to "review the substance of such a judgment." *Id.*

At least two other courts considering the interplay of psychological evaluations, security determinations, and *Egan* have come to similar conclusions. In *Foote*, the Department of Energy denied the plaintiff a Human Reliability Program certificate based on the "psychological evaluation of a Department psychologist." *Foote*, 751 F.3d at 657. The plaintiff alleged that the psychologist "recommended against certification because of [the plaintiff's] race." *Id.* Nevertheless, the D.C. Circuit held that the decision to certify an applicant, as made by a qualified agency psychologist, was "'an attempt to predict' an applicant's 'future behavior'" and thus "the kind of agency judgment that *Egan* insulates from review, absent a statute that specifically says otherwise." *Id.* at 659 (quoting *Egan*, 484 U.S. at 528).

Similarly, in *Sanchez*, the Tenth Circuit found *Egan* barred review of a refusal to recertify the plaintiff based on an agency psychologist's recommendation. *Sanchez*, 870 F.3d at 1189–90, 1193–94. It explained that the agency "must shoulder the delicate task of weighing the[] risks and safety margins while safeguarding the country's nuclear materials, devices, and facilities" and that this "balancing act should remain immune from our review." *Id.* at 1194. We see no reason to depart from that logic here.

20

Seeking to avoid this conclusion, Mowery argues that his case does not involve the kind of expert "predictive judgment" found in *Foote* and *Sanchez*, and thus that his challenge is not precluded by *Egan*, because there is nothing in the record disclosing (1) the evaluating CIA psychologist's name and specific credentials, or (2) any specific recommendation by the CIA psychologist to deny or halt Mowery's assignee-security processing. Reply Br. at 5. But there is nothing in *Egan* suggesting that such details are required. *See Egan*, 484 U.S. at 526–30. And Mowery cites to no regulations applicable here that would require this Court to know of, or evaluate, the psychologist's detailed qualifications. *Cf. Foote*, 751 F.3d 658–59 (relying on past D.C. Circuit precedent when examining whether the psychologist was "in the category of officials within the [agency] authorized and trained to make a judgment" about the applicant and noting that federal regulations governing the Human Reliability Program required specific education and experience minimums for designated psychologists (citing 10 C.F.R. § 712.33)). We therefore conclude that, in this case, such details are not determinative of whether *Egan* may shield an otherwise qualifying decision.

Accordingly, we hold that the CIA's decision to stop Mowery's assignee-security-authorization processing is the kind of discretionary predictive judgment shielded from judicial review by *Egan*.

2.

Mowery raises three counterarguments. First, he weakly contends that, as he seeks only injunctive relief, no substantive review of any national security decision is required. Second, he claims that we should decline to read *Egan* to apply to his situation because

21

he was afforded neither the specific reasons underlying the CIA's decision to cease his security processing, nor the opportunity to internally appeal the decision. Lastly, he argues that *Egan* does not prevent this Court from conducting something akin to *in camera* review to determine the agency's true reasons for halting his assignee processing. All three arguments are flawed.

i.

We turn first to Mowery's passing assertion that we need not substantively review any national security decision to grant him relief. To wit, he asserts he is only seeking an injunction prohibiting Defendants from *discriminating* based on religion in employment decisions, rather than an order *commanding* the CIA to "grant him any security clearances." Opening Br. at 29.

We, like the district court, are somewhat baffled by this argument. *See Mowery*, 550 F. Supp. 3d at 310–11. Injunctions are not magic beans that may be handed out without any analysis of the underlying claims or a showing that such relief is warranted. Instead, courts grant injunctions, if at all, only *after* reviewing the factual basis and merits (or likelihood of success on the merits) of a claim. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) (discussing the requirements for a permanent injunction); *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 188 (4th Cir. 2013) (discussing the requirements for a preliminary injunction). And if we were to review the merits of Mowery's claims, we would necessarily be reviewing the agency's predictive judgment, which we cannot do. *See Foote*, 751 F.3d at 658–59; *Sanchez*, 870 F.3d at 1193–94.

22

ii.

Next, Mowery asserts that *Egan* should not bar judicial review of his claims since that would leave him with "no valid recourse to address the harm he suffered." Opening Br. at 25. After all, in its email, the CIA expressly noted that its decision "d[id] not represent a security clearance denial," and that Mowery could not file an internal administrative appeal. J.A. 76. It would be grossly unfair, he contends, if this pseudo-denial were insufficient "to trigger internal rights to review laid out in [the CIA's] own policies" but was "sufficient to preclude judicial review under *Egan*." Opening Br. at 26. "Both cannot be true" at the same time, he asserts. *Id.*

But Mowery points to no controlling authority to support this contention. While provisions for meaningful administrative review of security-clearance denials may be a good practice, we agree with the district court's observation that *Egan* was not predicated on the existence of such procedures. *See Mowery*, 550 F. Supp. 3d at 312. To be sure, the Court in *Egan* did note that the plaintiff there was told of the specific reasons for his denial, given an opportunity to respond to the proposed denial, and given the opportunity to appeal. *Egan*, 484 U.S. at 521–22. But its holding did not turn on the existence of said process.[12] Instead, *Egan* was based upon fundamental separation-of-powers principles. *See id.* at 527–30 (holding that "unless Congress specifically has provided otherwise," "outside nonexpert bod[ies]," including courts, cannot attempt to substitute their

---

[12] Indeed, the *Egan* Court cited a D.C. Circuit case that referred to the denial of a clearance "*on unspecified grounds.*" *Egan*, 484 U.S. at 529 (emphasis added) (quoting *Molerio v. F.B.I.*, 749 F.2d 815, 824 (D.C. Cir. 1984)).

23

judgments for those of the executive branch on matters of national security). And it is hard to see how the CIA's alleged failure to provide more detailed notice or further administrative relief can alter those fundamental principles or change the nature of the predictive national-security judgment made in this case.[13]

iii.

Mowery's final counterargument—that we may subvert *Egan* and conduct something akin to an *ex parte in camera* review in order to "strike the necessary balance" between the CIA's right to make final security determinations and employees' interests— similarly falls flat. Opening Br. at 27.

---

[13] Mowery has asserted no separate constitutional due-process claim in his complaint, before the district court, or before this Court, and such a claim would fail under *Egan* insofar as it related to the assignee-processing decision. *See Reinbold v. Evers*, 187 F.3d 348, 358 (4th Cir. 1999) ("[B]ecause an individual does not have a property or liberty interest in a security clearance, *Egan* precludes a due process claim based upon an agency's security clearance decision."); *Jamil v. Sec'y, Dep't of Def.*, 910 F.2d 1203, 1209 (4th Cir. 1990) (noting that while the plaintiff "did have a property interest in his continued employment," he "did not have a property interest in his security clearance"). Notably, however, "[w]hile [under *Egan*] this [C]ourt may lack the power to review the merits of the decision" to deny or revoke a security clearance, we "still possess[] the authority to require an agency . . . *to follow its own regulations* in making a security clearance determination." *Jamil*, 910 F.2d at 1208 (emphasis added). Yet Mowery's complaint does not allege any procedural violations or identify which applicable statutes or regulations the CIA and Geospatial Agency may have violated. *See id.* (rejecting the plaintiff's procedural claim where the plaintiff "complain[ed] that [the] notice [he received] was inadequate, but [did] not refer[] to any rule or regulation granting him the right to any notice at all"). While Mowery's opening brief points to Intelligence Community Policy Guidance 704.3—which governs the appeals process for denials and revocations of security clearances—and notes that certain procedural protections are in place for official denials of security clearances, he does not clearly assert that this provision applies to a cessation of processing for the CIA's additional security requirement. *See* Opening Br. at 26–27.

24

To start, Mowery waived consideration of this issue by failing to raise it before the district court. *See Zoroastrian Ctr. & Darb-E-Mehr v. Rustam Guiv Found.*, 822 F.3d 739, 753 (4th Cir. 2016) ("Issues raised for the first time on appeal are generally not considered by this Court.").

But even if we opt to reach this issue, Mowery's argument lacks merit. *Egan* does not create a mere privilege against disclosure of protected information. Instead, it operates to insulate an agency's discretionary predictive judgments regarding who can be trusted with sensitive information from second-guessing by an "outside nonexpert body." *Egan*, 484 U.S. at 527–30. Put differently, the Supreme Court's decision in *Egan* did not arise out of concern that sensitive information might be disclosed during judicial review, but from recognition of the fact that "*it is not reasonably possible* for an outside nonexpert body [like a court] to review the substance of such a judgment and to decide whether the agency should have been able to make the necessary affirmative prediction with confidence." *Id.* at 529 (emphasis added).

Therefore, any type of *in camera* review would be improper since, under *Egan*, courts may not review the merits of such decisions *at all* absent specific authorization from Congress. *See id.* at 529–30.

B.

Finally, in the alternative, Mowery asks that this Court remand the case with instructions that the district court allow him to amend his complaint to include unspecified "constitutional claims as this Court may deem appropriate." Opening Br. at 33. We decline to do so.

25

A district court's denial of leave to amend is reviewed for abuse of discretion. *Laber v. Harvey*, 438 F.3d 404, 428 (4th Cir. 2006). Here, however, there is no denial to review because Mowery never sought leave to amend his complaint in the district court. Thus, there is no abuse of discretion on the part of the district court in not granting leave to amend.

Despite this, Mowery essentially asks this Court to grant him leave to amend in the first instance, without ever specifying the claims he wishes to add. We decline to grant such an amorphous request raised for the first time at the appellate level. *N. River Ins. Co. v. Stefanou*, 831 F.2d 484, 487 (4th Cir. 1987) (declining to consider plaintiff's argument that the "case should be remanded to the district court with instructions to allow him to amend" his complaint because he raised this argument "for the first time on appeal").

IV.

For the foregoing reasons, we affirm the district court's dismissal for lack of subject-matter jurisdiction and deny Mowery's request for a remand to amend his complaint.

*AFFIRMED*

26